# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE SAN JOSE CHARTER OF THE
HELLS ANGELS MOTORCYCLE CLUB,
an unincorporated association;
JAMES ARNETT; MARNIE ARNETT;
ROBERT BRANCATO; LESLIE
BRANCATO; RONALD COOK; VICKI
BOZZI; FILLMORE CROSS; MARGARET
CROSS; TED DEMELLO; DEBORAH
VAN TASSEL; JAMES ELRITE; MOLLY
ELRITE; LARRY GORHAM; JEFFREY
PETTIGREW; JAMES SOUZA; ROBERT
VIEIRA; LORI VIEIRA; JAMES WELCH;
GREGORY WILKINS; DENISE WILKINS,
        *Plaintiffs-Appellees,*

        v.

CITY OF SAN JOSE, a municipal
corporation,
        *Defendant,*

        and

DECENA, Sgt.; CARNEY, Sgt.;
MESSIER, Officer; NIEVES, Officer;
MICHAEL FERNANDEZ, Police
Officer, San Jose Police Officer;
WILLIAM MANION, Police Officer,
San Jose Police Officer; D.
NEWMAN, Police Officer, San Jose
Police Officer; KNOX, Police
Officer, San Jose Police Officer,
        *Defendants-Appellants.*

No. 02-16329

D.C. No.
CV-99-20022-JF

THE SAN JOSE CHARTER OF THE
HELLS ANGELS MOTORCYCLE CLUB,
an unincorporated association;
JAMES ARNETT; MARNIE ARNETT;
ROBERT BRANCATO; LESLIE
BRANCATO; RONALD COOK; VICKI
BOZZI; FILLMORE CROSS; MARGARET
CROSS; TED DeMELLO; DEBORAH
VAN TASSEL; JAMES ELRITE; MOLLY
ELRITE; LARRY GORHAM; JEFFREY
PETTIGREW; JAMES SOUZA; ROBERT
VIEIRA; LORI VIEIRA; JAMES WELCH;
GREGORY WILKINS; DENISE WILKINS,
            *Plaintiffs-Appellees,*

                v.

CITY OF SAN JOSE, a municipal
corporation; DECENA, Sgt.; CARNEY,
Sgt.; MESSIER, Officer; NIEVES,
Officer; MICHAEL FERNANDEZ,
Police Officer, San Jose Police
Officer; WILLIAM MANION, Police
Officer, San Jose Police Officer;
D. NEWMAN, Police Officer, San
Jose Police Officer; KNOX, Police
Officer, San Jose Police Officer;
JORGE GIL-BLANCO, Officer;
CHARLES GILLINGHAM, Sheriff;
MARK TRACY, Sheriff; CITY OF
CAPITOLA; DONALD BRAUNTON; M.
LAPLANT, FBI Agent; KEITH LITTLE,
Officer;

No. 02-17132
D.C. No.
CV-99-20022-JF
OPINION

SAN JOSE POLICE DEPT. NET ENTRY
TEAM; SAN JOSE POLICE DEPT.
M.E.R.G.E. UNIT #2; JAMES GREER;
RONALD LEBAUDOUR; SANTA CLARA
POLICE OFFICERS; COFFMAN,
Officer; GILROY POLICE DEPT.,
                              *Defendants,*

                and

ROBERT LINDERMAN, Deputy
Sheriff, in his individual capacity,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted
December 3, 2003—San Francisco, California

Filed April 4, 2005

Before: Richard A. Paez, Marsha S. Berzon, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Bea

## COUNSEL

Ann Miller Ravel, County Counsel, Winifred Bota, Deputy County Counsel, and Aryn Paid Harris, Deputy County Counsel, Office of the County Counsel, San Jose, California, for defendant-appellant Linderman.

Richard Doyle, City Attorney, Michael G. Groves, Senior Deputy City Attorney, Clifford Greenberg, Senior Deputy City Attorney, Office of the City Attorney, San Jose, California, for defendants-appellants Decena, Newman, Manion, Knox, Carney, Messier, and Nieves.

Karen L. Snell, Kate Dyer, and Marc H. Axelbaum, Clarence, Snell & Dyer, LLP, San Francisco, California, for the plaintiffs-appellees.

## OPINION

PAEZ, Circuit Judge:

In this civil rights action under 42 U.S.C. § 1983, Defendants-Appellants, seven San Jose City Police Officers ("SJPOs")[1] and Deputy Sheriff Linderman, appeal from an order of the district court denying in part their motions for qualified immunity. This action arises out of the simultaneous execution of search warrants at the residences of members of the Hells Angels, and at the Hells Angels clubhouse on January 21, 1998. While executing one of the search warrants at the residence of plaintiffs Lori and Robert Vieira, the officers shot two of the Vieiras' dogs. While searching plaintiff James Souza's property, the officers shot and killed one of Souza's dogs. During the course of the searches at all of the locations, the officers seized literally "truckloads" of personal property for the sole purpose of showing in a murder prosecution that the Hells Angels had common symbols, which in turn would qualify it as a criminal street gang and therefore support a sentencing enhancement under California Penal Code § 186.22 against the defendant in that case. In seizing this "indicia" evidence, the officers seized numerous expensive Harley-Davidson motorcycles, a concrete slab, and a refrigerator door and in so doing, caused significant damage to the items seized as well as to other property.

In their third amended complaint, the plaintiffs alleged that the searches violated the Fourth Amendment. The defendants

---

[1]The SJPOs are defendants Sergeant Decena, Sergeant Carney, Officer Messier, Officer Nieves, Officer Manion, Officer Newman, and Officer Knox.

moved for summary judgment on the ground that they are entitled to qualified immunity. The district court, applying the two-part test established by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), for determining whether a public official is entitled to qualified immunity, denied their motions, in part. The SJPOs and Linderman appeal the denial of their motions for qualified immunity.

We affirm the district court's order denying the SJPOs and Linderman qualified immunity. We hold that Linderman's instruction to seize "truckloads" of personal property, including numerous motorcycles and a piece of concrete, for the sole purpose of proving that the Hells Angels was a gang was an unreasonable execution of the search warrants in violation of the Fourth Amendment. We further hold that at the time the searches were carried out the law was sufficiently clear to put a reasonable officer on fair notice that this conduct was unlawful.

We also hold that the shooting of the dogs at the Vieira and Souza residences was an unreasonable seizure, and an unreasonable execution of the search warrants, in violation of the Fourth Amendment. Exigent circumstances did not exist at either residence, as the SJPOs had a week to consider the options and tactics available for an encounter with the dogs. Nonetheless, the officers failed to develop a realistic plan for incapacitating the dogs other than shooting them. Finally, we hold that the unlawfulness of the officers' conduct would have been apparent to a reasonable officer at the time the officers planned for serving the search warrants.

## I.

### A.  STATEMENT OF FACTS

*A.  Events Leading to the January 21, 1998 Search*

On August 24, 1997, Kevin Sullivan was beaten to death at the Pink Poodle nightclub in San Jose. Linderman of the Santa Clara County Sheriff's Office led the murder investigation. He ultimately determined that Steve Tausan, one of the nightclub's bouncers and a member of the San Jose Charter of the Hells Angels Motorcycle Club ("SJHA"), committed the crime.[2] Linderman also suspected other SJHA members and associates of concealing evidence of the murder.[3]

The District Attorney's Office charged Tausan with the murder of Kevin Sullivan. On October 6, 1997, Linderman applied for a warrant to search the SJHA clubhouse and the residences of various individuals alleged to be affiliated with the Hells Angels. On the basis of Linderman's 27-page affidavit and the testimony of confidential informants, Santa Clara County Superior Court Judge John Ball issued the search warrants on the same day, authorizing a search of the clubhouse and the individual residences for a security videotape depicting the beating of Sullivan, financial records connecting the Hells Angels to the Pink Poodle, and notes of a Hells Angels meeting held five nights after the killing. Police investigative

---

[2]According to the security guard at the Pink Poodle, Kevin Sullivan was harassing a dancer at the nightclub and had been told that the Pink Poodle employed Hells Angels members as bodyguards. Sullivan responded with derogatory remarks about the Hells Angels. The owner of the nightclub called Tausan and told him what happened. Tausan allegedly arrived ten minutes later and beat and killed Sullivan.

[3]A witness told Linderman that there was a videotape of the incident made over the Pink Poodle security system. The witness stated that he believed that a copy of the tape had been given to the Hells Angels.

officers recovered meeting minutes after several exhaustive searches, but failed to find the alleged videotape.[4]

In January 1998, the District Attorney's Office sought a second set of search warrants for nine residences and the SJHA clubhouse. In support of the application for the second set of warrants, Linderman submitted a 24-page affidavit, which incorporated his October 6, 1997 affidavit. Judge Ball issued the warrants as requested on January 20, 1998. The ten warrants were substantially identical except for the location and the name of the resident. The second set of warrants again authorized the seizure of a copy of the security videotape, and notes or records of a Hells Angels meeting held on the Friday following the murder of Sullivan.[5] Judge Ball also authorized a search for evidence that showed indicia of Hells Angels affiliation, including "any evidence of membership in, affiliation with, activity of, or identity of, any gang, including but not limited to, any reference to 'Hells Angels.' " The purpose of this provision in the warrants was to obtain evidence supporting a street gang sentencing enhancement against Tausan under California Penal Code § 186.22 because, allegedly, the murder had been committed in furtherance of the criminal conduct of the Hells Angels "gang."

Prior to the January 1998 searches, the Sheriff's Office had arranged for assistance from multiple law enforcement agencies, including the San Jose City Police Department. There were two types of law-enforcement teams that assisted with the execution of the warrants. First, "entry teams" composed of San Jose City police officers were used to enter the prem-

---

[4]The October 7, 1997 search is not a subject of this appeal.

[5]In a ruling not at issue in this appeal, the district court ruled that the affidavit supporting the search warrant was insufficient to establish probable cause to search for the videotape or meeting notes. The court, however, found that the warrant was supported by probable cause for the purpose of seeking gang indicia evidence. The plaintiffs do not challenge the probable cause determination in this interlocutory appeal.

ises surrounding the residences and secure safe entry into the residences. Once the location was secured, "search teams" composed only of officers from the Sheriff's Office were to conduct the searches and take possession of property covered by the warrant. Leaders of the entry teams were given approximately one-week advance notice of the action in order to prepare for the searches.

At 7:00 a.m. on the morning of January 21, 1998, teams of law enforcement officers simultaneously served the search warrants at residences of members of the Hells Angels in various parts of Santa Clara and Santa Cruz counties. It is the conduct of the law enforcement personnel in carrying out these searches under the second set of warrants that gave rise to plaintiffs' claims.[6]

## B.   San Jose Police Officers

The role of the SJPOs was to effect entry and secure the premises at the various locations for the search teams. The Vieiras and Souza both had large, aggressive dogs. The SJPOs shot and killed dogs at both residences.

### 1) Souza Residence

The entry operation at the Souza home was supervised by Sergeant Decena, who learned about the search a week prior to the operation. Officer Newman supervised the search of Souza's residence. He obtained Souza's arrest record, which revealed that Souza had been arrested for weapons and narcotics charges. The team also received background information which showed that there were two guard dogs, one which was a Rottweiler, at the Souza residence. During surveillance

---

[6]The district court held that the search of Jeffrey Pettigrew's residence did not violate a clearly established constitutional right, and therefore, the defendants were entitled to qualified immunity with respect to that search. The plaintiffs have not challenged that ruling on appeal.

before the search, the SJPOs saw a sign on Souza's side gate stating "Warning Property Protected By Guard Dog;" the officers also learned that Souza owned a Rottweiler that was known to attack without provocation.

The officers planned to gain entry into Souza's house by having a primary team go through the front door, while a secondary team entered through a side gate to secure the backyard and to allow for the safe search of a second smaller building. The plan was for the officers to make both entries simultaneously and to announce their presence with a knock notice at the front door.

The SJPOs planned either to isolate or to shoot the dogs, so they would not threaten the safety of the primary entry team. The officers had no plan to use non-lethal methods of incapacitation; nor did they have a specific plan for "isolating" the dogs or any intention of giving Souza the opportunity to isolate his Rottweiler himself.

On the day of the search, the primary entry team entered through the front door of the main house[7] while the secondary team unsuccessfully tried to cut the lock on the side gate with bolt cutters. The secondary team's failure to gain entry through the gate caused them to enter the main house following the first team, at which point the secondary team informed the first team that they had failed to gain access to the backyard through the side gate. Although both teams were safely inside the house, the backyard remained unsecured and the dogs remained on the loose. We note, however, that because Souza was not home the teams could have conducted their search inside the house without hurriedly dealing with the dogs in the backyard.

---

[7]Souza was not home, so the entry team members broke down the front door after receiving no answer to their knock.

Nonetheless, after entering the backyard through the main house, two of the officers proceeded to patrol the yard to look for the Rottweiler. Because miscellaneous objects and machinery strewn across the yard created obstacles to both motion and sight, the officers kept their firearms (MP-5 automatic rifles) drawn. Then, according to Officer Manion,

> [t]he [R]ottweiler suddenly appeared around the corner, approaching from the west at a distance of about ten to fifteen feet. It looked at me, gave a low growl, and started advancing toward me. I feared that the dog was going to attack me and I immediately discharged my firearm pulling the trigger twice.

Officer Manion's shots killed the Rottweiler instantly. The SJPOs left unharmed a small white dog that was also present but was judged to pose no threat once the Rottweiler had been killed.

### 2) Vieira Residence

Sergeant Carney supervised the search operation for the Vieira residence and was given about a week to plan the search. Like Souza, the Vieiras had not been accused of any crime. Officer Messier, the team leader, conducted surveillance and gathered intelligence several days prior to the operation which revealed that: (1) Robert Vieira had prior weapons-related convictions; (2) the Vieira property included a residence and a junkyard completely encircled by a tall, padlocked, cyclone fence, and (3) there might be dogs, although the number and breed were unknown. Messier assigned Officer Nieves the task of handling any dogs that might be present. The plan for entering the property was to cut the lock on the outer fence, approach the house, give knock-notice, then enter and secure the house.

At the Santa Clara Sheriff's Office briefing on the morning of the operation, Sergeant Carney was told that the Vieira

property, in particular, was guarded by three large dogs. Officer Nieves, who was assigned the duty of protecting the entry team, planned to deal with the dogs in the following manner: First, he hoped that the dogs would not appear at the gate. If they did, he planned to poke them through the fence with his shotgun and try to scare them. (Officer Nieves carried a shotgun specifically because of the possible presence of dogs.) If that did not work, he planned to assess the situation and engage the dogs, to ensure the safety of the entry team. Because the SJPOs believed that they needed to secure quick entry to preserve an element of surprise and prevent the possible destruction of evidence, they had no intention of calling on the Vieiras to control their dogs.

When the entry team approached the Vieiras' gate, three large dogs resembling Bullmastiffs emerged and ran toward the gate barking and growling. As the officers stuck their hands through the fence to cut the lock, one of the dogs jumped and snapped at their hands. Although the SJPOs were armed with pepper spray, no officer attempted to use the spray to subdue the dogs.[8] Instead, Officer Nieves attempted to scare the dogs away by yelling at them and pushing one of the dogs back with the barrel of his shotgun. The dogs, however, would not retreat, and the persistent barking caused Officer Nieves to fear that the surprise of the mission might be compromised.

Officer Nieves pointed his shotgun at one of the barking dogs and shot it. The first dog went down, but the second dog did not retreat. Officer Nieves shot at the second dog twice, critically wounding it, causing it and the third dog to retreat.[9] Although he had already shot the first dog at point blank

---

[8]The officers did not bring with them any of the variety of non-lethal "pain compliance" weapons used by police forces, such as tasers or stun-bag shotguns.

[9]The second dog was later taken by an Animal Control Officer and euthanized due to extensive injury.

range, Officer Nieves testified that the dog "was apparently trying to get back up . . . [a]nd in an effort to ensure that he wasn't going to attack or be a problem for the team," Officer Nieves fired a fourth shot at the dog's head, killing it. The SJPOs left unharmed the third dog, which retreated to a hiding place away from the officers, and the fourth dog, which was chained in the backyard.

Meanwhile, the noise outside awoke Robert Vieira. He emerged from the house at the second floor balcony just as the officers gained entry through the gate. The police instructed him to remain where he was with his hands up. An officer broke through the front door using a ram. When the SJPOs reached Robert Vieira, they located a firearm propped up against the bedroom window.

## C. Linderman's Seizure of "All" Indicia of Membership In the Hells Angels

The January search warrants included a provision for the seizure of property with indicia of Hells Angels affiliation, to assist the prosecution in obtaining evidence to support a gang sentencing enhancement against Tausan under Penal Code § 186.22. To this end, the search warrants authorized seizure of:

> Any evidence of membership in affiliation with, activity of, or identity of, any gang, including but not limited to, any reference to "Hells Angels," "HA", "Red & White", "81", "Big Red Machine", "HAMC", including, but not limited to, "West Coast OM notes", "East Coast OM notes", "BHC newsletter", including, but not limited to, drawings, paintings, photographs, photograph albums, videotapes, writings, furniture, furnishings, fixtures, and objects known, or which may appear by content, to depict or contain mention of membership in, affiliation with, activity of, or identity of, any gang, including, but

not limited to, the following: names, initials, and monikers of known, or which may appear by content, to be gang members or affiliates; acronyms, logos, slogans, symbols, signs, and expressions known, or which may appear by content, to identify a gang or any of its members or affiliates; and identifying numbers, colors, and expressions of a geographic region with which a gang is known, or which may appear by content, to associate. . . .

On the day of the January 1998 search, separate search teams from the Santa Clara Sheriff's Office conducted the searches and seizures once the various premises were secured. Although Linderman did not personally participate in the execution of all of the warrants, he coordinated the efforts of the law enforcement agencies, made the initial risk assessment with respect to each location, and answered questions called in by officers at the search sites.

The search teams at the Hells Angels' residences found that there were numerous items that bore indicia of Hells Angels affiliation. Fearing that they might take too many items, several officers called Linderman to clarify what items should be seized. Linderman instructed them to take everything that constituted "indicia" of Hells Angels affiliation as defined in the warrant, including belts, jewelry, plaques, t-shirts, hats, watches, vests, calendars, clocks, sculptures, photographs, and correspondence. The officers conducting the searches also took larger articles such as motorcycles, a mailbox, a refrigerator door with decals, and a cement portion of the driveway in front of the clubhouse containing the signatures of Hells Angels members. At the end of the searches, the teams carted away "literally truckloads of Hells Angels indicia" and had to rent special offsite storage to accommodate the large amount of evidence.

## II.

### STANDARD OF REVIEW

We review *de novo* a district court's decision regarding qualified immunity. *Elder v. Holoway*, 510 U.S. 510, 516 (1994). The evidence must be viewed in the light most favorable to the non-movant. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). "To the extent that the defendants' arguments quibble with the district court's view of the facts, we do not consider them. We view the evidence in the light most favorable to the plaintiffs." *Ganwich v. Knapp*, 319 F.3d 1115, 1119 n.5 (9th Cir. 2003).

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth a two-pronged inquiry to resolve all qualified immunity claims. First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. Second, if so, was that right clearly established? *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id*. at 201; *see also Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002).

## III.

### DISCUSSION

### A. *Search for All Indicia of Hells Angels Affiliation*

We affirm the district court's denial of qualified immunity to Deputy Sheriff Linderman.

The plaintiffs allege that Linderman's instruction to seize every item with indicia of Hells Angels affiliation, including customized Harley-Davidson motorcycles and a refrigerator door, was an unreasonable execution of the search warrants in violation of their Fourth Amendment rights. They further argue that the manner in which the warrants were executed under Linderman's instructions was unreasonable because the officers caused unnecessary destruction of property, including jack-hammering the sidewalk in front of the Hells Angels clubhouse to remove a piece of concrete with the Hells Angels' names. The plaintiffs argue this conduct violated their Fourth Amendment right to be free of "unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively." *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997).

**[1]** The test of what is necessary to "execute a warrant effectively" is reasonableness. "An officer's conduct in executing a search is subject to the Fourth Amendment's mandate of reasonableness from the moment of the officer's entry until the moment of departure." *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997). "When officers obtain a warrant to search an individual's home, they also receive certain limited rights to occupy and control the property; however, the Fourth Amendment binds the officers such that the right to search a home concomitantly obliges the officers to do so in a reasonable manner." *Id*. at 1350.

In examining whether Linderman caused the officers to execute the warrants unreasonably, "it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution." *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978). This is because "[t]he standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion." *Berger v. New York*, 388 U.S. 41, 70 (1967) (Stewart, J., concurring). Here, the January 1998 search warrants authorized a search of the Hells Angels' resi-

dences for (1) a videotape of scenes from the Pink Poodle on August 24, 1997; (2) indicia of Hells Angels affiliation or membership; and (3) notes or records of meetings at the Hells Angels clubhouse. Although the officers did not find the videotape or meeting notes, the officers seized numerous items of Hells Angels indicia. It is the manner in which the officers carried out this latter objective that, in part, led to the plaintiffs' civil rights action. Viewing the facts in the light most favorable to the plaintiffs, we conclude that the authority to seize indicia evidence to support a sentencing enhancement against Tausan did not justify the level of intrusion and excessive property damage that occurred during the search of the various locations.

[2] The search for indicia of Hells Angels affiliation served a limited purpose. The property here in dispute was not evidence of a crime; rather, the justification for seizing the indicia evidence was to support a sentencing enhancement against Tausan. As Linderman explained at his deposition, the indicia evidence was "evidence towards the gang enhancement. That's what it was being seized for." In the Tausan murder trial, the prosecution sought to prove the applicability of a three-year sentencing enhancement by showing that Tausan was a member of an "ongoing organization, association, or group of three or more persons . . . having a common sign or symbol." Cal. Penal Code § 186.22. The prosecution sought this evidence from the plaintiffs, who were neither co-defendants with Tausan in the murder trial nor charged with any crime. To prove the sentencing enhancement, the officers seized "literally truckloads" of evidence. The officers seized belts, jewelry, plaques, t-shirts, hats, watches, vests, calendars, clocks, sculptures, photographs, and correspondence. They seized the plaintiffs' Harley-Davidson motorcycles, most worth over $20,000, because they contained indicia of Hells Angels affiliation. The officers jack-hammered and removed a piece of the sidewalk in front of the Hells Angels clubhouse because some of the members' names were written on it. The officers also removed the door to the (working)

clubhouse refrigerator because it had a Hells Angels decal on it. The clubhouse mailbox and clubhouse street sign that read "Angels Place" were also seized.

[3] As the Eighth Circuit noted in reviewing a similar warrant for indicia evidence (also served on the Hells Angels), such evidence diminishes in evidentiary value the more evidence is seized:

> The indicia warrants, like many warrants, authorized the search of nearly every corner of the residence. Unlike most warrants, these warrants were issued to obtain evidence on just one fact—membership in the Hells Angels. Unlike most warrants, the evidence on this issue would be needlessly cumulative once enough evidence was obtained to establish membership. While additional evidence would usually show the breadth of criminal activity, in the instant case additional evidence would at some point have no additional probative value in determining membership.

*United States v. Apker*, 705 F.2d 293, 302 (8th Cir.), *modified on other grounds*, *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983) (en banc). Despite the "truckloads" of evidence seized during the searches, the prosecution only presented a few seized photographs at Tausan's trial. The motorcycles, concrete slab, and refrigerator door were not offered to support the gang enhancement at Tausan's trial.

Although the seizure of the indicia evidence was for the limited purpose of establishing a sentencing enhancement against Tausan, Linderman nonetheless instructed every officer who called him to seize anything with Hells Angels indicia.[10]

---

[10]When Deputy Sergeant Denis called about the motorcycles at the Pettigrew residence, Linderman instructed Sergeant Denis to seize them. He gave the same answer to Deputy Bacon when he called about a motorcycle

In so doing Linderman asserts that he was simply complying with the terms of the search warrants and that the officers executed the warrants in a lawful manner. Testimony of other officers involved in the searches, however, shows that at least some questioned whether this extensive seizure was necessary. Officer Faler testified that he was "surprised" when Linderman told him to seize everything because "[i]t just seemed like there were so many items in there that had Hells Angels or—as described on the search warrant, that it just seemed like we had more than enough." Officer Tomlinson testified that "there's an implied reasonable there" and it "never occurred to me to take the motorcycle" even though it had a Hells Angels decal on it.

[4] Linderman's primary defense is that the warrants specified the quantity and kind of evidence to be seized, and that he had no power to deviate from the explicit specifications. Linderman's argument depends on reading the word "any" in the search warrant as equivalent to "all"—and the concomitant assumption that he not only had the power to seize "all" indicia evidence, but could not lawfully exercise his discretion to seize anything less. This argument is unpersuasive. First, the word "any" in the search warrants did not mean "all." The relevant text of each search warrant itself draws a distinction between "any" and "all." While the search warrants authorized the search for "any" indicia evidence, at another point the search warrants authorized the search for "any *and all* yards, garages . . . for the following property." (emphasis added). Plaintiffs also point to the first definition

_____

at the residence of Fillmore Cross and to Deputy Greer when he called about a motorcycle at the residence of James and Marnie Arnett. When Deputy Pennington called Linderman about the piece of concrete with the names of Hells Angels members to ask "did he want me to go through the trouble to have somebody come down with a cement saw," Linderman said to remove the piece of concrete. Linderman personally made the decision to seize the motorcycle at Ted DeMello's address when he was present at the search, and signed the inventory sheet.

of "any" in Webster's Collegiate Dictionary: "one or some indiscriminately of whatever kind, . . . one or another taken at random <ask any man you meet>." As the district court noted in denying Linderman's Motion for Reconsideration, "a directive that the search teams seize only a sampling of gang indicia from each location would have complied with the literal terms of the search warrant and would not have required Linderman to substitute his own discretion for the terms of the warrant itself."

**[5]** Second, even assuming Linderman's construction of "any" as "all," while the search warrant gave Linderman the power to instruct the officers to seize items with Hells Angels indicia, it did not mandate that he order them to seize everything complying with the literal terms of the warrant. The purpose of having a particularized, as opposed to general, warrant is to " 'assure[ ] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.' " *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)). In other words, a search warrant gives an officer the "power" to seize the items specified in the warrant. While an officer generally does not have the power to seize anything not specified in the warrant, he retains discretion over the execution of the search and, as is implicit in the word "power," can exercise discretion to leave items that may arguably come within the literal terms of the search warrant.[11]

---

[11]Linderman nonetheless asserts that he had no discretion. For support, he cites *Marron v. United States*, which stated that "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 275 U.S. 192, 196 (1927). Linderman, however, misunderstands *Marron*. *Marron* stands for the proposition that an officer has no discretion to seize items *not* listed on a warrant meeting the Fourth Amendment's particularity requirement. As the search warrant delineates the officer's power to search, the officer has no "discretion" to exceed that power. An officer, however, does retain discretion as to how to reasonably execute a search. "It is difficult to imagine that a case could arise where an officer executing

Moreover, the record indicates that other officers understood that they had discretion not to seize some items with Hells Angels indicia. Lori Vieira's journal, introduced as an exhibit at her deposition, recounts a conversation during the search with Officer Garcia who supposedly said he was going to seize her "blue bus" because it had a Hells Angels sticker on it, but "decided not to." Linderman's position, however, is that the warrant *required* seizure of the bus because it had a Hells Angels decal. Similar to that position is a hypothetical raised in the district court hearing on May 28, 2002: If a Hells Angels member lived in a mansion made of stone with columns all around it and decided to write his initials on every column, would that give law enforcement officers the power to tear out a column as evidence that he lived there if the warrant authorized the seizure of any evidence proving that he did? The answer is clearly no.

**[6]** The unreasonable nature of Linderman's instructions to seize all evidence of indicia is highlighted by the destruction of property caused by the seizures. In executing the warrants, the officers cut the mailbox off its post, jack-hammered the sidewalk outside the clubhouse, and broke the SJHA's refrigerator. This "unnecessarily destructive behavior, beyond that necessary to execute [the] warrant[s] effectively, violates the Fourth Amendment." *Liston*, 120 F.3d at 979.

**[7]** We also hold that at the time Linderman directed the officers to seize "truckloads" of Hells Angels indicia in support of a sentencing enhancement, even if it meant removing a refrigerator door, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. At the time the warrants were

a valid search warrant would not at some stage in the matter be required in the very nature of things to exercise his judgment as to what thing or things or person or persons were to be seized under the warrant." *Strauss v. Stynchcombe*, 165 S.E.2d 302, 307 (Ga. 1968).

served, a reasonable officer would have been aware that an unreasonable execution of a search warrant violated the Fourth Amendment. *See Liston*, 120 F.3d at 979; *see also Lawmaster*, 125 F.3d at 1349. Linderman knew that the search for indicia evidence was for the limited purpose of establishing that the Hells Angels was a gang. Despite this limited purpose, he instructed officers to seize numerous expensive motorcycles, a piece of concrete, and a refrigerator door. None of these items, not even photographs of these items, were presented at Tausan's trial.

[8] Linderman argues that he nonetheless is entitled to qualified immunity because there is no clearly established law in this case-specific context. Linderman is not entitled to qualified immunity "simply because there [is] no case on all fours prohibiting [this] particular manifestation of unconstitutional conduct." *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1131 (9th Cir.), *cert. denied*, *County of Humboldt v. Burton*, 537 U.S. 1000 (2002) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1274-75 (9th Cir. 2001)). There need not be prior authority dealing with this precise factual situation in order to deny Linderman qualified immunity for his actions. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Sorrels*, 290 F.3d at 970. Rather, the state of the law at the time the warrants were served must have provided Linderman with "fair warning" that his conduct was unconstitutional. *See Hope*, 536 U.S. at 741. We conclude that it did and that the unlawfulness of Linderman's conduct would be apparent to a reasonable officer.[12] Accordingly, we affirm the district court's denial of qualified immunity in this instance.

*B.   Shooting of the Dogs*

We also affirm the denial of qualified immunity to the

---

[12]Indeed, several officers executing the search questioned whether the extensive seizure was necessary, indicating their understanding that the warrant did not *require* seizure of *all* material coming within its terms.

SJPOs involved in the shooting of the dogs at the Souza and Vieira residences.

**[9]** "[T]he destruction of property by state officials poses as much of a threat, if not more, to people's right to be 'secure . . . in their effects' as does the physical taking of them." *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds*, *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002) (citation omitted). "The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment" and can constitute a cognizable claim under § 1983. *Id*.

**[10]** Reasonableness is the touchstone of any seizure under the Fourth Amendment. Thus, to comply with the Fourth Amendment, the seizure—in this case, shooting and death—of the Vieiras' and Souza's dogs must have been reasonable under the circumstances. We look to the totality of the circumstances to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties. *See Deorle*, 272 F.3d at 1279. "A seizure becomes unlawful when it is 'more intrusive than necessary.' " *Ganwich*, 319 F.3d at 1122 (quoting *Florida v. Royer*, 460 U.S. 491, 504 (1983)). To determine whether the shooting of the dogs was reasonable, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation marks omitted).

**[11]** Here, the intrusion was severe. The officers shot and killed one of Souza's dogs, and two of the Vieiras' dogs. We have recognized that dogs are more than just a personal effect. *See Miller v. Clark County*, 340 F.3d 959, 968 n.13 (9th Cir. 2003). The emotional attachment to a family's dog is not comparable to a possessory interest in furniture. As noted in Lori Vieira's journal, the effect of her being handcuffed just

yards from where her dog Sam lay dead and bleeding was extremely traumatic.[13]

**[12]** Viewing the facts in the light most favorable to the Vieras and Souza, the seizures were unreasonable, in violation of the Fourth Amendment. Most important, both entry teams had a week to plan the execution of the entry. At the Souza residence, despite advance knowledge of the presence of two guard dogs, the full extent of the plan to protect the entry team from the dogs was to either "isolate" or shoot the dogs. The officers had no specific plan for isolating the dogs. At the Vieira residence, Officer Nieves was in charge of handling the dogs. According to Officer Messier's declaration, "Officer Nieves was assigned to deal with dogs if there were any, *which is why he had a shotgun* and was first in the stacking order. However, I did not give Officer Nieves any specific instructions as to how to deal with any dogs." (emphasis added). Officer Nieves's "little plan" consisted of first hoping that the dogs would not appear at the gate. If they did, he planned to poke them through the fence with his shotgun to try and scare them. If that did not work, he planned to "engage"[14] the dogs to ensure the safety of the entry team. In short, as the district court concluded, despite a week to plan for the entry, the officers developed no realistic plan other than shooting the dogs while serving the search warrants.

Nonetheless, the officers identify three governmental interests to justify the intrusion: (1) the law enforcement interests in accomplishing the goals of the search warrant, *i.e.*, seeking evidence of a murder; (2) the need for stealth and speed, cou-

---

[13]At Lori Viera's deposition, she testified that she wrote in her journal, "I had to stand again not far from by [sic] poor dog (Sam). By now blood had drained from him and was running down the driveway. (I am crying now because I can see him, laying there, and all that blood. All that blood, for what.)"

[14]At Nieves' deposition, he conceded that when he said he "engaged" the dogs, he meant that he aimed his shotgun and shot at the dogs.

pled with the fact that the searches were simultaneous (in order to avoid one subject informing others); and (3) the safety of the officers.

Although the search warrants were obtained in connection with a murder investigation, none of the plaintiffs were potential suspects. The defendants were seeking a videotape and meeting minutes as evidence of the murder at the Pink Poodle. As the district court concluded, however, there was insufficient probable cause to believe that either the videotape or the meeting minutes would be found at the residences. The district court ruled that the warrants were supported by probable cause only with respect to the search for evidence with indicia of Hells Angels affiliation.[15]

[13] The SJPOs' contention that shooting the dogs was necessary to preserve stealth is equally unpersuasive. It was the officers' own method of entry that compromised their ability to effectuate a quiet entry. At the Souza residence, the SJPOs used a ram to break down the front door before they even dealt with the dogs; at the Vieira residence, the residents were awakened not by the barking of their dogs, but rather by the four shotgun blasts discharged at the dogs. If Officer Nieves truly feared that continued barking would "alert the residents and possibly jeopardize the mission," it was an unreasonable response—indeed, an utterly irrational one—to fire four shotgun blasts to "engage" the dogs. All of the above considerations support the conclusion that the officers violated the plaintiffs' Fourth Amendment rights by unnecessarily shooting the dogs.

While the governmental interest of safety might have provided a sound justification for the intrusion had the officers been surprised by the presence of the dogs, the same reason-

---

[15]Again we do not review the determination that there was probable cause to search for indicia lacking any connection to the defendant, as the issue is not before us.

ing is less convincing given the undisputed fact that the officers knew about the dogs a week before they served the search warrants. The officers had substantial time to develop strategies for immobilizing the dogs. They knew or should reasonably have known that the Fourth Amendment requires officers to avoid intruding more than is necessary to enforce a search warrant. *See Ganwich*, 319 F.3d at 1122. As the district court explained, the officers "created an entry plan designed to bring them into proximity of the dogs without providing themselves with any non-lethal means for controlling the dogs. The officers, in effect, left themselves without any option but to kill the dogs in the event they—quite predictably—attempted to guard the home from invasion."

Having determined that the officers violated the plaintiffs' Fourth Amendment rights for purposes of the first step in the qualified immunity analysis, the second step asks whether the constitutional right was clearly established. As the Supreme Court has cautioned, it is not enough that there is a generally established proposition that excessive use of force is unlawful. *Saucier*, 533 U.S. at 202. "[T]he right that the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

However, "it is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *Sorrels*, 290 F.3d at 970 (citation omitted) (alteration in original). "In other words, while there may be no published cases holding similar policies unconstitutional, this may be due more to the obviousness of the illegality than the novelty of the legal issue." *Id.* In *Hope*, the Supreme Court recognized that previous cases do not have to be "fundamentally similar" and that officials can still be on notice even in novel factual circumstances. 536 U.S. at 741. Both parties

concede that the ultimate question is whether the state of the law at the time was clear enough to provide reasonable officers with sufficient notice that their conduct was unlawful.

**[14]** Prior to the events at issue in this case, we had held that unnecessary destruction of property in the course of executing a warrant is unconstitutional. *Liston*, 120 F.3d at 979. We also had held that the killing of a person's dog constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest. *See Fuller*, 36 F.3d at 68; *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211-12 (3d Cir. 2001); *Lesher v. Reed*, 12 F.3d 148, 150-51 (8th Cir. 1994). We also had recognized that in assessing reasonableness under the Fourth Amendment an appropriate factor is whether the officer considered alternatives before undertaking intrusive activity implicating constitutional concerns. *See Chew v. Gates,* 27 F.3d 1432, 1440 n.5 (9th Cir. 1994); *see also Gutierrez v. City of San Antonio*, 139 F.3d 441, 450 (5th Cir. 1998).[16] These cases should have alerted any reasonable officer that the Fourth Amendment forbids the killing of a person's dog, or the destruction of a person's property, when that destruction is unnecessary—*i.e.*, when less intrusive, or less destructive, alternatives exist.   A reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment.

It is no doubt true, as the Third Circuit's *Brown* case hypothesized, that there are potential cases in which the state's interest may be sufficiently compelling to "justify the extreme intrusion occasioned by the destruction of the pet."

[16]After the events in this case, we also applied this principle in *Headwaters Forest Defense*, 276 F.3d at 1131 (holding that the use of pepper spray was not justified when protesters could have been removed in another less intrusive manner).

*Brown*, 269 F.3d at 210-11. However, *Brown* discussed cases where dangerous animals, *e.g.*, lions, were roaming free endangering the public, not situations where officers intentionally entered into the enclosed perimeter of the property where lawfully held dogs were present to protect the property from unlawful intruders.

[15] Finally, this case is not the kind where the officer was reacting to a sudden unexpected situation, where the officers were confronted with exigent circumstances. The Fourth Amendment allows officers to use a certain amount of force because they are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving. . . ." *Graham*, 490 U.S. at 397. In this case, however, the SJPOs were given a week to plan the entry. Other than the officers' interest in preserving evidence, the officers were not presented with exigent circumstances that necessitated killing the dogs. Accordingly, the failure to develop any realistic non-lethal plan for dealing with the dogs is simply not the type of reasonable mistake in judgment to which a court should give deference in determining whether the officers are entitled to qualified immunity.[17]

[16] In sum, in these circumstances, a reasonable officer would have known that the killing of the dogs at the Souza and Viera residences was unlawful. Thus, we affirm the district court's denial of the SJPOs' motion for qualified immunity.

AFFIRMED.

---

[17]The police officers' opportunity to plan ahead distinguishes this case from the recent Supreme Court decision, *Brousseau v. Haugen*, 125 S. Ct. 596 (2004) (holding that there was qualified immunity for police officers who were considering "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"). In this case, there was no element of surprise coloring the officers' judgment.

BEA, Circuit Judge, concurring in part and dissenting in part:

I agree with almost all of the majority opinion. For the officers here to have conducted these searches without any plan by which to control the dogs other than to shoot them is outrageous, especially given that they knew about the dogs well in advance. Clearly, a reasonable officer would have understood that his actions violated an established right of the plaintiffs. I must dissent, however, from part III.A of the majority's opinion. I would reverse the district court's order denying Deputy Sheriff Linderman qualified immunity.

Judge Ball issued several search warrants on January 20, 1998. The issue here is whether the evidence, taken in the light most favorable to the plaintiffs, establishes that Officer Linderman's instructions to seize "all" evidence covered by the search warrant violated an established constitutional right of the plaintiffs, and whether it would be clear to a reasonable officer that his conduct was unlawful in the situation Linderman confronted. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Lee v. Gregory*, 363 F.3d 931, 934-36 (9th Cir. 2004).

Here, the precise language of the warrants is important. The warrants *commanded* (not authorized) the officers to seize a very broad range of evidence in search of several crimes:

> YOU ARE THEREFORE COMMANDED, in the daytime, to make search of premises . . . for the following property:
>
>> 1) A video tape or copy thereof depicting scenes and images from the Pink Poodle night club on or about August 24, 1997 in all of the described premises;
>>
>> 2) Any evidence of membership in, affiliation with, activity of, or identity of, any gang, including but not limited to, any ref-

erence to "Hells Angels," "HA", "Red & White," "81", "Big Red Machine", "HAMC", including, but not limited to, "West Coast OM notes," "East Coast OM notes", "BHC newsletter", including, but not limited to drawings, paintings, photographs, photograph albums, videotapes, writings, furniture, furnishings, fixtures, and objects known, or which may appear by content, to depict or contain mention of membership in, affiliation with, activity of, or identity of, any gang, including, but not limited to, the following: names, initials, and monikers of known, or which may appear by signs, and expressions known, or which may appear by content, to identify a gang or any of its members or affiliates; and identifying numbers, colors, and expressions of a geographic region with which a gang is known, or which may appear by content, to associate;

3) Notes or records of the Hells Angel meeting at the Hells Angel Clubhouse, . . . on Friday, August 29, 1997 and July through November 1996;

And if you find the same or any part thereof, to hold such property in your possession under California Penal Code Section 1536, or to release the property to the appropriate agency for state or federal forfeiture proceedings.

The district court denied Linderman's motion for summary judgment based on qualified immunity, reasoning that because the word "any" could be read to mean "one, some or all," Linderman had a duty to take only a representative sam-

pling. The word "any" can mean "all" just as easily as it can mean "some." Webster's defines the word "any" as:

> 1: one or some indiscriminately of whatever kind: a: one or another taken at random <ask *any* man you meet> b: **EVERY** — used to indicate one selected without restriction <*any* child would know that>;
>
> 2: one, some, or all indiscriminately of whatever quantity: a: one or more — used to indicate an undetermined number or amount <have you *any* money> b: **ALL** — used to indicate a maximum or whole <needs *any* help he can get> c: a or some without reference to quantity or extent <grateful for *any* favor at all>;
>
> 3a: **unmeasured or unlimited in amount, number, or extent** <*any* quantity you desire> b: appreciably large or extended <could not endure it *any* length of time>.

WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2002) (bold emphasis added). Given that Linderman was commanded to seize any evidence meeting the broad description in the warrant, he was not unreasonable in construing the warrant literally, and certainly it is not clear that a reasonable officer would have known that Linderman's conduct was unlawful in the situation he confronted. The officers were searching for evidence of a murder, possibly gang related. This was not a traffic offense they were investigating.[1] There

---

[1]The majority opinion minimizes the importance of the searches by stating: "The property here in dispute was not evidence of a crime; rather, the justification for seizing the indicia evidence was to support a sentencing enhancement against Steve Tausan." Majority Op. at 3955. The majority opinion is mistaken. The warrants read that the police were to look for "evidence of the commission of felonies, to wit: violations of (California Penal Code Section 187 (murder), Penal Code Section 211 (robbery), and (evidence of active participation in the felonious conduct of a criminal street gang as defined in Penal Code § 186.22." (capitalization altered).

was also a strong suspicion that other members of the Hells Angels might have been involved in covering up evidence of the crime.

Plaintiffs do not claim that Linderman told the other officers to seize property that fell outside the scope of the warrant. The refrigerator door, the mailbox, the motorcycles, and especially the portion of the sidewalk in front of the clubhouse in which members of the Hells Angels had written their names in the concrete while it was still wet, all contained indicia of the club's existence and the composition of its membership, essential evidence to prove the gang enhancement under California Penal Code section 186.22. Neither is there any evidence that Linderman knew exactly which gang indicia would establish that Tausan was a member of the Hells Angels gang, and had committed the murder pursuant to gang activities. Tausan could well have had a nickname or used a symbol to identify himself.

The district court found that because a representative sampling of gang indicia evidence would have sufficed to prove the existence of the Hells Angels, Linderman's instructions to seize "all" of the evidence were unreasonable. The district court, and the majority opinion, rule that Linderman was required to exercise discretion in deciding how much evidence was enough. The law does not impose such a burden on police officers.

In support of the proposition that police officers have a duty to seize only a sampling of indicia evidence, the majority opinion cites *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997) and *United States v. Apker*, 705 F.2d 293, 302 (8th Cir.), *abrogated on other grounds*, *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983). Both cases are inapposite here.

In *Liston*, the police were sued for destruction of property and unreasonably detaining the homeowners when they exe-

cuted a search warrant for a previous owner, James Rocky Hill, upon the new owners of a home, the Listons. The district court denied the officers' motion for summary judgment based on qualified immunity. This court affirmed in relevant part, holding there were material issues of fact for a jury as to whether it would be clear to a reasonable officer that the conduct of the officers who conducted the search for Hill's effects was unlawful, when the search was effected on the Listons, not Hill, the suspect named in the warrant.

The evidence produced by plaintiffs included evidence that the police had broken through their front door with a battering ram, thrown Mr. Liston to the floor injuring him, pointed a gun at Mr. Liston's face even though he was not resisting the police, and held the entire family for several minutes while the police went through the house "trashing" it. *Id*. 970-71. The Listons offered undisputed claims that the officers destroyed the front door, broke down the fences surrounding the backyard, dug holes in the backyard and left garbage and the Liston's personal property throughout the house. *Id*. 972.

The Listons also produced evidence that the police did all this after the Listons informed the police that they had just purchased the house from Hill, the subject of the warrant; the police saw a "For Sale" sign in the yard which said the house had "Sold"; and, the police found the escrow papers for the sale from Hill to the Listons and Mr. Liston's driver's license. *Id*. Mrs. Liston testified that the police knew they were in the wrong house and were making jokes about it shortly after they entered the house. *Id*. at 972. In light of the evidence that the police were acting outside the scope of the warrant, this court held that such evidence raised a fact question as to whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted and precluded summary judgment based on qualified immunity. *Id*.

As the court recognized in *Liston*, it was not clear the destruction of property by itself violated a constitutional right.

"[O]fficers executing a search warrant occasionally 'must damage property in order to perform their duty.' " *Id.* 979 (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)). "Until the officers learned that they were in the wrong house, the officers could have reasonably believed, under these precedents, that the way they conducted the search was lawful. As a result, they would be entitled to qualified immunity. But once they knew the house belonged to the Listons, their search was no longer justified." *Id.*[2]

There is no claim that Linderman executed the search warrants at the wrong location or upon the wrong people, nor that the officers destroyed any property that did not fall within the scope of the warrant.

*Apker* also involved a question different from the one presented here. *Apker*, did not hold that officers have a duty to take only a representative sample of evidence described in an indicia warrant. In *Apker*, the appellants challenged the indicia warrants as violating the requirement under the Fourth Amendment that the things to be seized be described with particularity. The court in *Apker* ruled that the indicia warrants did not meet the Fourth Amendment's particularity requirement and consequently the seizure was unlawful. 705 F.2d at 297-98.

The plaintiffs here also challenged the warrants. The district court found that the affidavit supporting the search warrants was insufficient to establish probable cause to search for the videotape or meeting notes. However, the court found that

---

[2]The hypothetical posed by the district court that it would have been unreasonable for an officer to cut a column off a house because it had the owners' initials on it is also inapposite. It would have clearly resulted in substantial harm to property that was not described in the warrant—the house. Here, the concrete sidewalk had the names of the members of the Hells Angels' club inscribed in it and the plaintiffs do not claim its removal caused any consequential damage. All the evidence seized or damaged fell within the scope of the warrant.

the warrants were supported by probable cause for the purpose of seeking gang indicia evidence. Plaintiffs did not appeal this ruling. It is not clear whether the plaintiffs also challenged the warrants as not satisfying the particularity requirement of the Fourth Amendment, but that challenge is not raised here. Although I might well have agreed that this warrant was overly-broad on its face, that issue is not before us.

While it is true the police do not have discretion to go outside the bounds of the warrant, neither do they violate a plaintiffs' constitutional rights when they seize evidence pursuant to a valid search warrant. That is what warrants are for—to limit the evidence that can be seized and the areas to be searched. It is not the police officer's role to determine how to limit the scope of the warrant. It is the function of the independent magistrate to assure that there is probable cause to issue the warrant and that the warrant is drafted narrowly and the things to be seized are described with particularity.

Finally, there are good reasons for not requiring officers to exercise their own discretion as to how much evidence is enough. Linderman was not the deputy district attorney who would try the case and was not in a position to judge whether the trial court would admit into evidence photographs of the objects instead of the objects themselves or whether, in this era of digitally altered images, defense counsel would ridicule a photograph as tainted by police technicians, should the original object not be produced. At the time of the search, Linderman did not know what evidence would be found, how that evidence might or might not prove Tausan was a member of the Hells Angels, nor exactly what needle the district attorney might find in that haystack. Often it is only by searching through a large volume of evidence that an attorney is able to find the few crucial pieces of evidence that establish the case. It was not Linderman's role during the simultaneous search of

several residences to pre-judge what would or would not turn out to be important.[3]

Because the police were looking for evidence of a murder, and a possible gang enhancement charge, and, most importantly, because the police did not seize any evidence that was outside the scope of the warrant, I fail to see how a torn-up sidewalk, spoiled food in the refrigerator, and the loss of a mailbox rise to the level of a constitutional violation. Accordingly, I dissent from the denial of qualified immunity to Linderman.

---

[3]Neither is it up to Linderman to judge the dramatic effect on a jury of the demonstrative evidence, such as the concrete sidewalk where the Hells Angels' members had signed their name.