**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELAINE BRITTAIN,
            *Plaintiff-Appellee,*

v.

WILLIAM HANSEN; REBECCA SCOTT;
COUNTY OF SAN BERNARDINO,
            *Defendants,*

and

BRIAN CAMPBELL, #C0191,
            *Defendant-Appellant.*

No. 03-57012

D.C. No.
CV-01-00595-VAP

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
September 15, 2005—Pasadena, California

Filed June 22, 2006

Before: J. Clifford Wallace, Barry G. Silverman, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Wallace;
Concurrence by Judge Silverman

**COUNSEL**

Dennis E. Wagner, Deputy County Counsel, San Bernardino, California, for defendant-appellant Brian Campbell.

George G. Romain, Haney, Buchanan & Patterson, L.L.P., Los Angeles, California, for plaintiff-appellee Elaine Brittain.

**OPINION**

WALLACE, Senior Circuit Judge:

Appellant Police Officer Brian Campbell takes this interlocutory appeal from the district court's denial of his sum-

mary judgment motion based upon qualified immunity. We have jurisdiction pursuant to 28 U.S.C. § 1292. We reverse.

**I.**

This appeal arises out of a child custody dispute between Elaine Brittain and William Hansen, the unmarried parents of Matthew Brittain (Matthew). Brittain and Hansen had previously litigated custody of Matthew in the San Bernardino Superior Court. The adjudication resulted in a custody order awarding Hansen sole legal custody of Matthew, who was thirteen years old at the time of the events in dispute. Although Hansen was the sole legal guardian, the superior court awarded visitation rights to Brittain.

The custody order included a visitation schedule which governed in the event that Brittain and Hansen were unable to agree on one of their own. Brittain and Hansen rarely agreed on a schedule. Two paragraphs of that order are central to this appeal:

> 11. The last week during each period the minor is off track from school, or if minor is not in a year-round program, for three non-consecutive weeks during summer vacation. Mother is to notify Father prior to May 15 of each year of the three weeks during summer vacation she intends to have the minor. If the parties cannot agree on the specific three weeks, Mother shall have the minor the last full week of each of the months of June, July, and August.
>
> 12. Father shall have the right to a three or four week vacation each year in which he may remove the minor from the state of California and during which time the Mother's visitation shall be suspended. Father will give Mother a one month written notice of the dates he intends to take his vacation.

On July 20, 2000, Hansen gave Brittain notice that he would be taking Matthew for vacation from August 21 to September 3, 2000. When Hansen delivered the note, he told Brittain that no replacement week would be provided.

On August 20, Hansen arrived at Brittain's house to pick up Matthew. Matthew went outside and told his father that he would not be going with him because it was Brittain's week for visitation. Brittain called the police. It was not unusual for law enforcement to be called to mediate this custody dispute; Matthew estimated that it had occurred around forty times. By the time Deputy Sheriff Dorough arrived, Hansen had left. Brittain showed him the custody order. Dorough indicated that he believed Brittain's interpretation of the visitation order was correct.

Hansen returned the following day to Brittain's residence with his sister, Rebecca Scott. Shortly thereafter, approximately 2:30 p.m., Officer Campbell arrived at Brittain's residence. Hansen handed Campbell a copy of the child custody order and a copy of Hansen's note informing Brittain of his intention to take Matthew on vacation. Campbell reviewed the documents and discussed the dispute with Hansen.

Campbell then telephoned Brittain and asked her and Matthew to come out of the residence. Brittain came out into the front yard and opened a gate to admit Campbell onto the property. Campbell and Brittain then discussed the custody dispute and order. Brittain acknowledged receiving Hansen's July 20 note and never disputed the validity of the custody order. Campbell stated that he believed paragraph 12 controlled and therefore Hansen was entitled to custody for the disputed week.

At this point, Brittain unsuccessfully attempted to call her lawyers. Brittain then called the Highland Police Department and asked to speak to the watch commander. After speaking with Brittain, the watch commander asked to speak with

Campbell. At some point during this call, Campbell switched on his recorder. Brittain stated that Campbell became irate because she had called his supervisor and thereafter spoke to her in alternately a "hostile and condescending tone" or "aggressive and condescending tone."

After speaking with the watch commander, Campbell and Brittain resumed their discussion over the custody dispute. Campbell expressed his opinion that "You can't stop at line 25. You have to go on and read 26, [beginning of paragraph 12] the rest of it." After additional argument, Brittain asked Campbell for more time to try to contact her lawyers again. Campbell refused and said that he was "deciding it right now." Campbell said that he was "going to take Matthew" and that "[h]e's going with [Hansen]." He then ordered Brittain to bring Matthew out of the house. Brittain also stated, and Campbell denies, that Campbell threatened her with arrest if she did not comply. After stating that she would sue Campbell and that "I can play any game I want with my son," Brittain agreed to bring Matthew outside the house.

The transfer of Matthew to Hansen was then apparently accomplished without further incident. Campbell stated that Matthew never indicated that he did not wish to go with Hansen. Matthew stated he was not sure if he told Campbell that he did not wish to go with Hansen.

Campbell estimated that he had previously handled between five and ten custody disputes during his fifteen years as an officer. In those previous instances, Campbell did not order an objecting parent to transfer a child.

Campbell testified that he had never met Hansen, Scott or Brittain previously. However, Brittain has pointed to evidence that allegedly supports the inference that there was a conspiracy between Campbell, Hansen, and Scott to deprive Brittain of her visitation rights. In an April 4, 2000 incident, law enforcement officers were called to mediate a similar dispute

and sided with Brittain. Matthew testified that Scott said that "next time [we're] going to get [our] cop." Matthew also testified that, at some point, his aunt "did meet a cop at a bar," although Matthew did not know to which officer Scott was referring. Matthew also believed that Campbell may have called Hansen and Scott by their first names. Matthew stated that Scott and Hansen were "laughing and smirking" at times during the dispute. Lastly, Matthew testified that Campbell appeared to know that Hansen intended to go to Oceanside for the vacation.

Brittain also argues that a tape recording from Campbell's belt recorder of parts of the August 20 incident shows a conspiracy among Campbell, Hansen and Scott and evidence tampering. Brittain points out that the tape was not turned on until about five minutes into the incident and that the tape was turned off and on twice during the dispute. Based on this evidence, the district court found that there was a material issue of fact as to whether there was a conspiracy among Campbell, Hansen and Scott.

## II.

Although we ordinarily review only final judgments, officers are permitted to take an interlocutory appeal of a district court's denial of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir.), *cert. denied*, 126 S.Ct. 737 (2005). This is because qualified immunity is "immunity from suit rather than mere defense to liability . . . [and] is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526 (emphasis omitted). We do not resolve factual disputes on interlocutory review, *see Johnson v. Jones*, 515 U.S. 304, 313-17 (1995), but "[w]here disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct." *KRL v. Moore*, 384 F.3d 1105, 1110 (9th Cir. 2004), *quoting*

*Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (as amended). We review a district court's denial of summary judgment based on qualified immunity de novo. *Genzler*, 410 F.3d at 636.

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Consideration of qualified immunity in a Section 1983 claim raises two questions. *Menotti v. City of Seattle*, 409 F.3d 1113, 1152 (9th Cir. 2005). Under the approach set out by *Saucier v. Katz*, we first must ask "whether a constitutional right would have been violated on the facts alleged." 533 U.S. 194, 200 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* at 201.

If a constitutional violation is established, we consider "whether that right was 'clearly established' such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Menotti*, 409 F.3d at 1152, *quoting Saucier*, 533 U.S. at 202. "This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case." *San Jose Chapter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir.), *cert. denied sub nom.*, *Decena v. San Jose Charter of Hells Angels Motorcycle Club*, 126 S.Ct. 796 (2005), *citing Saucier*, 533 U.S. at 201. "Under the *Harlow* standard . . . an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley*, 475 U.S. at 341. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *City of San Jose*, 402 F.3d at 971, *quoting Saucier*, 533 U.S. at 202. "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley*, 475 U.S. at 341.

## III.

We turn first to Brittain's substantive due process claim. There are four issues we must discuss in resolving this claim.

## A.

The district court relied upon precedents concerning seizure of children from custodial parents based on allegations of child abuse, primarily two of our precedents, *Ram v. Rubin*, 118 F.3d 1306 (9th Cir. 1997), and *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 1999), to hold that "the Fourteenth Amendment prohibited [Campbell], absent an emergency, from depriving plaintiff of custody of Matthew." Quoting *Ram*, the district court held that Brittain "could not be summarily deprived of that custody without notice and a hearing, except when the children were in imminent danger." The district court concluded that there was "no functional difference" between the issues of custody and visitation.

Both *Ram* and *Wallis* were cases in which social workers or police acted on the basis of suspected sexual abuse. *See Ram*, 118 F.3d at 1309; *Wallis*, 202 F.3d at 1134-35. Both cases have their doctrinal origins in, and relied upon, the Supreme Court decision in *Santosky v. Kramer*, 455 U.S. 745 (1982). *Santosky* required, before parents could permanently be deprived of custody based on child abuse, proof of that abuse by clear and convincing evidence at a hearing. *Id.* at 769-70. Some of our later precedents expanded this protection so that a custodial parent could not be deprived of physical custody on a temporary basis without either an emergency or

a pre-deprivation hearing. *See*, *e.g.*, *Ram*, 118 F.3d at 1310; *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir. 1991).

The first issue is whether the district court was correct that there is "no functional difference" between custody and visitation. We see this issue differently.

**[1]** There are vital distinctions between the child abuse precedents and the present matter that the district court failed to consider. First, permanent custody is a greater interest than a single visitation period. *Santosky*, for example, relied on the premise that "[w]hen the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." 455 U.S. at 759. Furthermore, "[i]f the state prevails, it will have worked a unique kind of deprivation." *Id.* (internal quotations and citation omitted). In the present case Brittain only alleges infringement that will not effect that "unique kind" of deprivation.

**[2]** Our sister circuits have recognized that visitation is a lesser interest than permanent custody. *See Zakrzewski v. Fox*, 87 F.3d 1011, 1013-14 (8th Cir. 1996); *Wise v. Bravo*, 666 F.2d 1328, 1332-33 (10th Cir. 1981). In *Zakrzewski*, the father-plaintiff had lost custody due to a divorce decree and only had visitation rights with his son. 87 F.3d at 1012. Central to its holding, the Tenth Circuit recognized that "Zakrzewski's liberty interest in the care, custody, and management of his son has been substantially reduced by the terms of the divorce decree . . . ." *Id.* at 1014. Similarly, *Wise* held that the liberty interest in visitation was sufficiently limited that interference with that interest did not give rise to a constitutional violation under 42 U.S.C. § 1983. *Wise*, 666 F.2d at 1333; *see also Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 394 (4th Cir. 1990) (holding that while some procedures are sufficient "when visitation and placement decisions are at stake, we believe that the greater liberty interest inherent in the custody of one's child requires something more"); *cf. Elk*

*Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13-18 (2004) (non-custodial parent lacks prudential standing to bring Establishment Clause challenge based on relationship with his daughter).

Treating visitation as identical to custody also fails to give effect to the state court judgment. That judgment, which awarded sole custody to Hansen, undeniably reduced Brittain's parental rights *vis-à-vis* Matthew. Those proceedings, whose validity is unchallenged, led to Brittain's loss of legal custody and left her only with visitation rights. That judgment undoubtedly had a profound impact on the relationship between Brittain and Matthew, and we would be treating it as a legal nullity if we held there was "no functional difference" between legal custody and visitation.

The nature of the actions is also significantly different. When the state seeks to terminate parental rights due to child abuse, the state is required to prove abuse or neglect by clear and convincing evidence. *Santosky*, 455 U.S. at 769-70. Such hearings necessarily are adversarial in nature, with the government bringing accusations of fault against parents. *Id.* at 748, 759-62 ("[T]he factfinding stage of a state-initiated permanent neglect proceeding bears many of the indicia of a criminal trial") (citations omitted). When the government brings legal actions against individuals and seeks to deprive them of liberty interests, the constitutional concerns are at their zenith. *See Santosky*, 455 U.S. at 756 (explaining that termination of parental rights based on child abuse requires heightened constitutional scrutiny because the actions are "*government-initiated proceedings* that threaten the individual with a *significant deprivation* of liberty or stigma") (internal quotations and citation omitted, emphasis added); *see also In re Winship*, 397 U.S. 358, 362-65 (1970) (requiring proof beyond a reasonable doubt for criminal convictions).

**[3]** By contrast, the states regularly adjudicate custody disputes between the parents on a "best interests of the child"

standard. *See Reno v. Flores*, 507 U.S. 292, 303-04 (1993) (" 'The best interests of the child,' a venerable phrase familiar from divorce proceedings, is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody"). Such proceedings involve no government accusations of fault or the government acting in an adversarial role against the parents. Indeed, the Supreme Court has stated that "persons faced with forced dissolution of their parental rights have a more critical need for procedural protections *than do those resisting state intervention into ongoing family affairs.*" *Santosky*, 455 U.S. at 753 (emphasis added). Rather than acting in a prosecutorial role, as the government does in child abuse cases, here Campbell acted to resolve a dispute between two individuals who both had liberty interests in the physical custody of Matthew.

**[4]** By failing to recognize the lesser liberty interest in visitation and the differing nature of this action from child abuse hearings, the district court applied an erroneous legal standard.

### B.

Having concluded that the child abuse cases are not the correct legal precedents to apply in this action, we must determine the framework that applies to the present situation: where an officer intervenes in a child custody dispute between parents, based on each parent's claimed entitlement to present custody.

Federal courts have "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open ended." *Albright v. Oliver*, 510 U.S. 266, 271-72 (1994) (plurality opinion), *quoting Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The Court has cautioned that we "must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty

protected by the Due Process Clause be subtly transformed into the policy preferences of [federal judges]." *Washington v. Glucksburg*, 521 U.S. 702, 720 (1997) (internal quotations and citation omitted). Furthermore, "the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States . . . ." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (internal quotations and citation omitted). Substantive due process is ordinarily reserved for those rights that are "fundamental." *See Glucksburg*, 521 U.S. at 721-22.

**[5]** This case further implicates two separate lines of Supreme Court cases in which the Court has urged particular caution: those regulating police conduct, *see Graham v. Connor*, 490 U.S. 386, 395 (1989) (refusing to extend substantive due process to claims against officers for arrests, stops, and excessive force), and those concerning domestic relations. *See Sosna v. Iowa*, 419 U.S. 393, 404 (1975) ("[D]omestic relations [is] an area that has long been regarded as a virtually exclusive province of the States") (punctuation omitted); *Newdow*, 542 U.S. at 12 ("[T]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States") (internal quotations and citations omitted).

**[6]** Brittain has offered no reason why the child abuse precedents should be expanded into parental child custody disputes and instead relies on the proposition that the child abuse precedents already directly apply to this case. As discussed previously, there are significant differences between these two areas. With no other proffered rationale and because of these significant distinctions, we will not create a new substantive due process right by extending the child abuse precedents into child custody disputes between parents.

Our holding does not fully resolve this claim, however. We must also examine more generally this constitutional protection to determine its application to this case.

**[7]** Substantive due process protects individuals from arbitrary deprivation of their liberty by government. *See Lewis*, 523 U.S. at 845-49. The Court has repeatedly "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* at 846. "[O]nly the most egregious official conduct can be said to be arbitrary in a constitutional sense." *Id.* (internal quotations and citation omitted). Such conduct can be shown by "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849.

**[8]** It is not enough to allege conscience shocking action, however. "As a threshold matter, 'to establish a substantive due process claim a plaintiff must show a government deprivation of life, liberty, or property.' " *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 948 (9th Cir. 2004) (punctuation omitted), *quoting Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). This is because "there is no general liberty interest in being free from capricious government action." *Id.* at 949 (internal quotations and citation omitted). Thus, in order to establish a constitutional violation based on substantive due process, Brittain must show both a deprivation of her liberty and conscience shocking behavior by the government.[1] We next discuss each of these requirements.

---

[1] The concurrence believes this appeal can be resolved solely on the basis that Campbell "acted reasonably in interpreting the ambiguous court order and in defusing the domestic dispute . . . ." Concur. op. at 6939. The concurrence asserts that the appeal "is as simple as that." *Id.*

This argument presupposes that the only legal issue is the reasonableness of Campbell's actions. Brittain argues, with some support, that substantive due process bars any governmental interference with her visitation rights without a specific court order. We are obliged to address this argument, which would require affirming the district court if she were correct. Because none of our precedents has set forth the applicable legal standard for evaluating police involvement in custodial disputes, our analysis of Brittain's argument is necessarily detailed.

Unlike the concurrence, we will not assert the case is "as simple as" assessing the reasonableness of Campbell's actions without first establishing that reasonableness is the applicable legal standard. Notably, the cor-

## C.

### 1.

**[9]** We first consider whether Brittain had a liberty interest in her court-ordered visitation rights. It is long-settled that custodial parents have a liberty interest in the "companionship, care, custody, and management" of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *see also Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (such right was "plain beyond the need for multiple citation"); *Miller v. California Dep't of Soc. Servs.*, 355 F.3d 1172, 1175 (9th Cir. 2004). We have not had occasion to decide whether parents who have visitation rights, but lack legal custody, have a similar liberty interest.

**[10]** Most of the federal circuits to reach this issue have determined that some liberty interest exists. *See Zakrzewski*, 87 F.3d at 1013-14; *Franz v. United States*, 707 F.2d 582, 594-602 (D.C. Cir. 1982) (considering complete and permanent severance of parental relationship after mother and chil-

---

rect legal standard is whether Campbell's actions "shock the conscience." Objective reasonableness is one means of assessing whether Campbell's actions meet that standard. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998).

While the concurrence suggests that a footnote in *Moreland* provides the applicable legal standard, *Moreland* considered a claim based on the allegedly reckless use of police force, whereas this appeal concerns custodial rights. Similarly, the concurrence's citation of an out-of-circuit Fourth Amendment precedent, *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000), also does not conclusively resolve the issue. While we agree with the concurrence that the same "shocks the conscience" standard ultimately applies, some additional analysis is required to reach this holding.

We understand our colleague's desire to simplify this appeal. This case is one of first impression, however, and some detailed analysis is required. We believe that reasoned analysis is preferable to unsupported assertions of what the applicable legal standard should be.

dren were placed in witness protection program); *Wise*, 666 F.2d at 1331-33. The Fourth Circuit implicitly found a liberty interest in visitation when it stated that while some remedies were sufficient for visitation, "the greater liberty interest inherent in the custody of one's child requires something more." *Weller*, 901 F.2d at 394. The Seventh Circuit has assumed that such a right exists. *See Terry v. Richardson*, 346 F.3d 781, 784 (7th Cir. 2003) (assuming, without deciding, that a non-custodial parent has a liberty interest in "care, custody, and control" of his or her offspring).

**[11]** The rationale of these cases is compelling and we therefore hold that non-custodial parents with court-ordered visitation rights have a liberty interest in the companionship, care, custody, and management of their children.[2] Such an interest is unambiguously lesser in magnitude than that of a parent with full legal custody. Similar to the Eighth Circuit, we hold that Brittain's "liberty interest in the care, custody, and management of [her] son has been substantially reduced by the terms" of the state court custody judgment. *See* Zakrzewski, 87 F.3d at 1014; *see also Weller*, 901 F.2d at 394. In doing so, we recognize the obvious reality that visitation is a lesser interest than legal custody, a fact to which parents seeking full legal custody of their children would undoubtedly attest. We reiterate that to hold otherwise would fail to give proper effect to the state court's judgment.

### 2.

**[12]** Having determined that Brittain has a liberty interest at stake, Brittain must show a deprivation of that interest to have a cognizable Section 1983 claim. Two of our sister circuits have held that a relatively minor infringement on this liberty interest in visitation will not give rise to a Section

---

[2]The fact that none of our prior decisions has addressed whether parents have a liberty interest in visitation is another factor that makes this appeal more complicated.

1983 substantive due process claim. *See Zakrzewski*, 87 F.3d at 1014-15; *Wise*, 666 F.2d at 1333; *see also Terry*, 346 F.3d at 786 (referring to *de minimis* approach of *Wise* and *Zakrzewski* but concluding it unnecessary to decide in that case whether that plaintiff's "interest is too insignificant to be actionable"); *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir. 1983) (citing *Wise* for proposition that visitation rights cannot give rise to Section 1983 action). The factual circumstances of both *Zakrzewski* and *Wise* are similar to the present action and merit our discussion.

In *Zakrzewski*, a divorce decree had given visitation rights to Zakrzewski with his son and sole legal custody to his ex-wife. 87 F.3d at 1012. After Zakrzewski properly took physical custody of his son for Memorial Day weekend, a dispute arose as to who had custody for the following week. *Id.* at 1013. The ex-wife's attorney called the sheriff's office and accused Zakrzewski of violating the terms of the divorce decree and requested assistance in regaining physical custody of the child. *Id.* The sheriff then called Zakrzewski, warning him that if he did not return his son, he would be charged with a felony. *Id.* Zakrzewski went to the sheriff's office to protest the demand, but the sheriff reiterated his warning. *Id.* On the way home from the sheriff's office, Zakrzewski was pulled over by two deputies who told him to turn over his son or they would arrest him. *Id.* Zakrzewski then agreed to deliver his son to his ex-wife. *Id.* The Eighth Circuit held that the infringement of Zakrzewski's liberty interest was not sufficient to give rise to a substantive due process claim. *Id*. at 1014-15.[3]

---

[3]The concurrence apparently believes that *Zakrzewski* takes a position contrary to *Wise* and "left open the possibility" that under different circumstances the same amount of deprivation might be constitutionally cognizable. Concur. op. at 6941. This belief is squarely at odds with the language in *Zakrzewski*. That case clearly states that its "holding that this case presents no constitutional violation is consistent with a similar Tenth Circuit case," 87 F.3d at 1014, *citing Wise*. Furthermore, *Zakrzewski*

Similarly, in *Wise*, the plaintiff-father had lost legal custody of his daughter in a divorce decree but obtained visitation rights. 666 F.2d at 1330. The Tenth Circuit described the situation which gave rise to his lawsuit as follows:

> On March 17, 1978, Wise took his daughter for an extended visit following an oral agreement with Gayle. On March 24, 1978, Gayle phoned Wise advising him that she wanted their daughter back that night. Wise refused, claiming that he didn't have to return the child at that time. . . . [B]oth Wise and Gayle called the Police Department. In addition, Gayle called Captain Bravo at his home. Later that evening, Captain Bravo and five other police officers arrived at Wise's apartment to retrieve the girl. The officers knocked on the door, identified themselves as police officers, and asked to come in. Upon seeing Bravo, Wise stated that he was "not welcome" in the apartment. Officer Avery stated that Bravo was an officer and had as much right as the rest to enter. The police then entered the apartment without further objection from Wise. Avery told Wise that they were there for the purpose of returning the little girl to her mother. Wise consented and released his daughter to the police officers.

---

quotes language from *Wise* that "any deprivation of Wise's visitation rights was so insubstantial in duration and effect it failed to rise to a federal constitutional level," and then states "[t]he case before us is, for the most part, indistinguishable from *Wise*, and *we agree with the reasoning set forth in that case.*" *Id.* (emphasis added). Thus, it is clear that *Zakrzewski* is not contrary to *Wise*.

The concurrence's quotation that "the one-time interpretation of Zakrzewski's right to visitation in this case does not amount to a deprivation of liberty" actually supports the proposition that a longer visitation period might give rise to a viable claim. It does not support the concurrence's apparent belief that a wrongful deprivation of visitation, no matter how short in duration, would support a substantive due process claim.

*Id.* Wise also stated that one of the officers "carried 'a little black decanter sort of thing,' which he assumed to be Mace, and that he felt threatened by the object's presence." *Id.* The Tenth Circuit concluded that "[a]ny deprivation of Wise's visitation rights was so insubstantial in duration and effect [that it failed] to rise to a federal constitutional level." *Id.* at 1333. The court further held that Section 1983 "should not be viewed as a vehicle to resolve a dispute involving visitation rights-privileges. That is a subject uniquely reserved to the state court system." *Id.*[4]

---

[4]Though prominently briefed by Campbell, Brittain failed to cite, let alone distinguish, *Wise* and *Zakrzewski* in her appellee brief. At oral argument, Brittain offered three unpersuasive reasons for distinguishing those cases. First, Brittain pointed out that the custody order granting Brittain visitation rights refers to "custody" and not visitation. Brittain therefore tried to distinguish those cases on the basis that Brittain has "custody rights" rather than visitation.

The use of the word "custody" to which Brittain refers is found in this sentence: "Mother shall have custody of Matthew for purposes of visitation for the following times . . . ." Moreover, the order grants "physical and legal custody" to Hansen and then specifies her rights under the heading "Mother's visitation rights." This reference to "custody" is obviously a reference to physical custody during visitation. The right involved in this case is clearly visitation and *Wise* and *Zakrzewski* cannot be distinguished on that basis.

Brittain next argued that the deprivation in this case is greater than in *Wise* and *Zakrzewski*. It is true that the visitation period in *Wise* is unclear because it was pursuant to an oral agreement that was not resolved by the court. *See Wise*, 666 F.2d at 1330, 1333. However, the disputed visitation period in *Zakrzewski*, like this case, was one week. 87 F.3d at 1012-13.

Lastly, Brittain attempted to distinguish *Wise* and *Zakrzewski* on the basis that the transfers of those children were "consensual." However, the close factual similarity of *Zakrzewski* once again refutes this argument. Like this case, the transfer of the child in *Zakrzewski* was effected only after repeated threats of arrest. 87 F.3d at 1013. Indeed, Zakrzewski had also been threatened with being charged with a felony. *Id.* at 1013. Similarly, in *Wise*, the transfer was accomplished after the police came to Wise's residence and ordered him to transfer the child, under the perceived threat of force. 666 F.2d at 1330.

The district court sought to distinguish *Wise* and *Zakrzewski* on the facts, however. The district court held that "[t]he most that can be said about *Wise* and *Zakrzewski* is that, under the facts of those cases, the courts held that the alleged violations did not rise to the level of a federal constitutional violation." Then, without any analysis distinguishing those facts from the facts of this case, the court said that the evidence proffered by Brittain was sufficient to state a constitutional violation. We do not believe the factual circumstances are materially different and we do not give such a restrictive reading to *Wise* and *Zakrzewski*. Like *Zakrzewski*, the transfer of the child was only accomplished under a threat of arrest (and also a threat of a felony charge), which led to the loss of one week of visitation. In both cases the police ordered the transfer of the child over the protest of the parent that they were entitled to custody. Lastly, in both cases, the police intervened in a child custody dispute and acted on behalf of the parent with legal custody. The attempt to distinguish these cases as presenting significantly different factual circumstances is unpersuasive.

We hold that the deprivation of Brittain's liberty interest in custody over Matthew, like the deprivations in *Wise* and *Zakrzewski*, did not rise to the level of a federal constitutional violation. In so holding, we are mindful that this case arises in the intersection of several fields of law where federal courts have shown the greatest hesitation in creating new federal mandates. We will not disregard this justifiable caution lightly. Substantive due process vindicates those interests which are fundamental and, contrary to Brittain's theory, may not to be used as a "font of tort law to be superimposed upon whatever systems may already be administered by the States . . . ." *Lewis*, 523 U.S. at 848 (internal quotations and citation omitted). Allowing Section 1983 substantive due process claims to proceed under the alleged deprivation of liberty here could have unfortunate consequences for our federal system. It could dramatically interject federal courts and federal law into domestic relations disputes involving children which, as

previously pointed out, is "an area that has long been regarded as a virtually exclusive province of the States." *Sosna,* 419 U.S. at 404; *see also Newdow*, 124 S.Ct. 2301 at 2309.

We are also mindful that Brittain's visitation rights, unlike custodial rights, are a creation of state law. The extent to which other creations of state law resembling parental rights, such as foster parents and de facto parents, give rise to accompanying constitutional liberty interests depends on the contexts in which the issues are raised. *See Miller*, 355 F.3d at 1176 ("Nor does the fact that the Millers were 'de facto' parents under California law for purposes of the juvenile court proceedings create a liberty interest in contact with the children")*; Backlund v. Barnhart*, 778 F.2d 1386, 1390 (9th Cir. 1985) ("The relationship between this foster parent and foster child is a creature of the Washington child welfare statutes. Those statutes confer no new due process rights"). In line with these cases, we believe that states should be given flexibility in interpreting and enforcing a right of their own creation.

We therefore agree with our sister circuits that some "gatekeeping" requirement is necessary to respect the strong federalism and judicial restraint concerns at issue in cases such as this. If any deprivation of visitation rights, no matter how slight, can give rise to a substantive due process claim, litigants will not only be able to use substantive due process as a "font of tort law," but also as a tool to transform federal courts into family courts. In the particular custody dispute before us, the police had been called out to mediate on as many as forty occasions. The proper venue to litigate at the very least most of these disputes is in state court. If every custody dispute, including ones only concerning a weekend or even an hour of visitation, can give rise to a federal claim necessitating federal interpretation of a state custody order, federal courts could rapidly become *de facto* family courts. Such a result is not permitted by Supreme Court jurisprudence.

It is not, however, for us to determine whether we should impose as strict a threshold requirement as *Wise* and *Zakrzewski*. We need not hold that visitation rights will never give rise to a substantive due process claim. *Cf. Wise*, 666 F.2d at 1333 (Section 1983 "should not be viewed as a vehicle to resolve a dispute involving visitation rights-privileges. That is a subject uniquely reserved to the state court system."); *Zakrzewski*, 87 F.3d at 1015 ("The case before us is, for the most part, indistinguishable from Wise, and we agree with the reasoning set forth in that case."). We need not reach the question whether interference with a lengthy visitation period or repeated interference with shorter periods may give rise to a cognizable substantive due process claim. We need not decide here whether interference that affects the existence of visitation rights altogether, rather than discrete instances of visitation, might give rise to a viable claim. Nor need we reach the question whether custodial parents may bring suit.

**[13]** The reason why we need not address these issues is because this is not such a case. Here the deprivation is of a single week period in a long-running custody dispute. Given the relatively short duration of the interference and limited nature of the liberty interest compared to custody, we hold that even if we departed from *Wise* and *Zakrzewski*, this case will not support a substantive due process claim.

**[14]** Regardless whether visitation rights collectively may be a "fundamental" liberty interest to the parent involved, we do not believe a single *instance* of visitation, of a single week in duration, is a "fundamental" right. As such, substantive due process does not provide a remedy in this case.

Our approach to resolving this case heeds the Supreme Court's directive to "avoid constitutional issues when resolution of such issues is not necessary for disposition of a case." *In re Snyder*, 472 U.S. 634, 642 (1985); *see also United States v. Sandoval-Lopez*, 122 F.3d 797, 802 n.9 (9th Cir. 1997) ("We avoid constitutional questions when an alternative basis

for disposing of the case presents itself"). Thus, we hold for another case whether child custody disputes may, and under what circumstances, can give rise to a substantive due process claim. While Brittain may well have possessed other state law claims, substantive due process will not provide her relief in this action.

A substantive due process claim is not a means for litigants or federal courts to subvert family courts. Nor is it an excuse to ignore strong concerns of federalism and judicial restraint. Even if a threshold requirement of deprivation of liberty is necessary to protect these interests, Brittain has failed to overcome that threshold.

### D.

[15] Brittain's claims also fail because Campbell's actions were not "conscience shocking" as a matter of law. Campbell's interpretation of the visitation order was reasonable. While there is a *potential* conflict between paragraphs 11 and 12, paragraph 12 (upon which Hansen and Campbell relied) contains a specific clause which provided for the cessation of Brittain's visitation when paragraph 12 was invoked. Brittain could point to no supersession clause and simply relied on the argument that this interpretation would allow Hansen to thwart the intent of paragraph 11. In refusing to accept Brittain's interpretation of the order, Campbell did not violate Brittain's substantive due process rights.

We need not decide whether Campbell's interpretation of the order is the best legal interpretation, because it is sufficient to conclude, as we do, that it was reasonable and not conscience shocking. We do not require police officers to act as legal experts to avoid violating the Constitution; substantive due process secures individuals from "arbitrary" government action that rises to the level of "egregious conduct," not from reasonable, though possibly erroneous, legal interpretation. Indeed, in *Zakrzewski* the state courts later held the cus-

todial parent in contempt for violating the custody order and denying Zakrzewski the visitation rights to which he was entitled. 87 F.3d at 1014. Nonetheless, the Eighth Circuit still held the officers' actions, though based on an erroneous legal conclusion that Zakrzewski was not entitled to custody, were not conscience shocking. *Id.*

**[16]** The decision to effectuate the transfer of Matthew, and thus enforce the state court judgment, was objectively reasonable as a matter of law. Campbell was presented with a lawful court order whose validity was conceded by Brittain. Although the relevant clause suspending her visitation rights was conditioned on notice being given at least one month in advance, Campbell was presented with evidence that such notice was given and Brittain conceded as much. Campbell then reasonably determined that, under the state court order, Hansen was entitled to custody at that point and that Brittain was in direct violation of her obligations under that order.

**[17]** These undisputed facts entitled Campbell to take at least two relevant actions under state law. Campbell was statutorily authorized under state law to take Matthew into protective custody if "[t]here are conflicting custody orders or conflicting claims to custody and the parties cannot agree which party should take custody of the child." Cal. Penal Code § 279.6(a)(3) (West 1999). Upon taking Matthew into protective custody, Campbell further would have been permitted, among other things, to "[r]elease the child to the lawful custodian of the child . . . ." *Id.* § 279.6(b)(1). Alternately, these facts would appear to have provided Campbell with probable cause that Brittain was engaged in a felony, *see* Cal. Penal Code § 278.5 (West 1999), by withholding a child from a lawful custodian, thus entitling him to arrest her. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may . . . arrest the offender"); *see also* Cal. Penal Code § 836 (West 2005) ("A peace officer may arrest a person . . .

[if] [t]he officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence [or the] person arrested has committed a felony, although not in the officer's presence.").

**[18]** Thus, Campbell had statutory authorization both to effectuate a transfer of Matthew and to arrest Brittain. In light of these powers, we hold, as a matter of law, that Campbell's actions were not conscience shocking. Indeed, they were objectively reasonable. *See Moreland*, 159 F.3d at 371 n.4 (if an officer's actions "were objectively reasonable, it follows that his conduct did not offend the more stringent standard applicable to substantive due process claims"). Even without specific statutory authorization to make the transfer, Campbell's reasonable actions to enforce the state court order, whose validity was conceded, is not conscience shocking. Nor does a threat to arrest Brittain change this analysis as Campbell appears to have possessed constitutional and statutory authorization to arrest her. *See Graham*, 490 U.S. at 396 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). Because Campbell's actions were not shocking, Brittain's substantive due process claim fails.[5]

---

[5]Although not identified by either party, two additional cases from our sister circuits address somewhat similar circumstances. In *Hurlman v. Rice*, the Second Circuit considered a situation in which police officers effected the transfer of a child, under threat of arrest, from a custodial parent to a parent with visitation rights. 927 F.2d 74, 77-78 (2d Cir. 1991). The officers did so on the basis of an order to show cause why she should not be stripped of custody. *Id.* at 76. Furthermore, while the order in *Hurlman* contained a provision ordering immediate transfer of the child, that provision had been stricken by a state judge. *Id.* Holding the dispute to be primarily factual, the Second Court dismissed the interlocutory appeal for lack of appellate jurisdiction. *Id.* at 78-81.

*Hurlman* is readily distinguishable from the present action. First, the applicable order was not a state court judgment whose validity was uncon-

Brittain's "conspiracy" evidence does not alter our determination of reasonableness. Under the *Harlow* objective reasonableness standard, subjective intent is not a relevant inquiry. *See Malley*, 475 U.S. at 341 ("Under the *Harlow* standard . . . an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner"); *see also Saucier*, 533 U.S. at 210 (Ginsburg, J., concurring in the judgment) ("Underlying intent or motive are not relevant to the inquiry; rather, 'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them' "), *quoting Graham*, 490 U.S. at 397.

Thus, as long as Campbell's actions were objectively reasonable, his subjective intent is irrelevant. Brittain's conspiracy allegations all amount to issues of intent, which while

---

tested, but rather an order to show cause. Furthermore, authorization to transfer the child immediately had been specifically rejected by a state court judge. Finally, the police transferred the child from a custodial parent to a non-custodial parent, without any claimed right to physical custody at that time. *Hurlman* therefore presents no bar to holding Campbell acted reasonably.

In *Wooley v. City of Baton Rouge*, the Fifth Circuit reversed summary judgment based on qualified immunity in a case involving a police-ordered transfer of a child. 211 F.3d 913, 927 (5th Cir. 2000). There, police officers, acting on conflicting custody orders, required a transfer of a boy from a woman caring for him, under the direction of the mother, to the paternal grandparents. *Id.* at 917-18. Both sides produced family court orders which established their right to custody. *Id.* at 917. Based on a specific Louisiana requirement for a civil warrant before transferring a child, the Fifth Circuit held the officers' actions were not objectively reasonable and denied qualified immunity. *Id.* at 926. *Wooley* has already been effectively distinguished on the basis of the Louisiana civil warrant requirement in a case strikingly similar to this present action. *See Williams v. Blaisdell*, 173 F. Supp. 2d 574, 582 (N.D. Tex. 2001) (holding officer's actions were objectively reasonable in ordering transfer of child in visitation dispute based on court order). Furthermore, California not only lacks such a warrant requirement, but affirmatively grants the police the authority to transfer the child to the custodial parent through protective custody.

disputed, are not relevant. Brittain's allegations regarding the tape recording similarly are not relevant.

Brittain has also alleged that Campbell acted with "hostility" towards her during the August 21 incident. She asserts Campbell spoke to her in a "very hostile and condescending tone" as well as "nasty tone of voice." However, substantive due process does not guarantee a pleasant tone of voice or courteous manner and assertions of hostile tone of voice do not otherwise transform Campbell's actions into conscience shocking conduct.

Finally, Brittain contends that because Campbell's usual "policy" was not to order transfer of a child in similar circumstances, Campbell's actions shock the conscience by deviating from his past practice. At oral argument, Brittain's counsel stated that:

> The issue is not whether it is unreasonable for a police officer to look at a court order, and to enforce it. The issue is whether it was unreasonable for a police officer who has been in similar circumstances before, and has adopted a procedure, which is to do nothing and let the parties resort to the state court . . ., to decide on this particular occasion to deny my client . . . that opportunity.

Brittain has not cited any cases to support this proposition.

It is not conscience shocking that an officer would act in a non-identical fashion in cases presenting similar (though not identical) factual circumstances. This is especially true when the alleged "procedure" is formed from five to ten previous cases, spread over fifteen years, whose facts are not before us. Campbell need not act with perfect consistency in similar circumstances to avoid violating the Constitution. The standard for substantive due process violations is conscience shocking behavior, not adherence to personal policy.

Brittain's suggestion, if accepted, would also unnecessarily burden police officers by preventing them from learning on the job or adapting their procedures to new circumstances. Substantive due process at most requires reasonable behavior, not perfect personal consistency. Moreover, the procedures for domestic relations are properly left to the states to develop within constitutional limits. *See Sosna,* 419 U.S. at 404; *Wise,* 666 F.2d at 1332.

**[19]** Thus, even assuming that Brittain's version of the material facts is correct, she has failed to establish a violation of substantive due process. Brittain has established neither a sufficient deprivation of liberty nor conscience shocking conduct. The district court therefore erred in denying summary judgment to Campbell on Brittain's substantive due process claim.

## IV.

We next turn to Brittain's procedural due process claim. The district court applied two child abuse precedents, *Ram* and *Wallis*, to hold that children cannot be removed from their parent without notice and a pre-deprivation hearing, absent imminent danger to the child. On appeal, Brittain, citing *Ram* and *Wallis*, urges that "the accepted rule is that an official may not effectively resolve a disputed custody issue between a parent and another without following any due process procedures."[6] Although *Ram* and *Wallis* both required pre-

---

[6]The concurrence appears to believe that we can resolve this claim on the basis that Brittain does not undertake a *Matthews v. Eldridge* analysis and because "Brittain makes no further effort at describing what process Officer Campbell owed her, and that is fatal to her procedural due process claim." Concur. op. at 6942. However, "it is [the court's] job, not the plaintiffs', to explicate the standard that makes the facts alleged by the plaintiffs adequate or inadequate to state a claim. [The court] cannot non-suit *them* for [its] failure to do so." *See Vieth v. Jubelier*, 541 U.S. 267, 301 (2004) (plurality opinion). Thus, *we* are required to set forth the applicable legal standard for determining whether the state's actions violate Brittain's due process rights.

deprivation hearings in child abuse cases, we have already pointed out that it was erroneous to apply child abuse precedents directly to child custody disputes. Child abuse precedents, while potentially instructive, do not control this case or dictate the constitutionally required procedures. Because of the differing nature of child abuse actions, the procedural safeguards required for resolving custodial disputes will ordinarily be less than those required in the child abuse precedents.

**[20]** "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 125 S. Ct. 2384, 2393 (2005). Having held that Brittain has a protected liberty interest in the "companionship, care, custody, and management" of her child by virtue of her visitation rights, we must decide what process Brittain was due.

Procedural due process claims should not be subject to *de minimis* analysis. Unlike substantive due process claims, in which interests either do or do not give rise to a claim, *see Brown*, 722 F.2d at 364 (listing protected interests which will not give rise to a Section 1983 claim), procedural due process claims are resolved by balancing tests, where differing interests can give rise to many differing procedural requirements.

Moreover, Brittain has asserted what process she believes is required—a pre-deprivation hearing—which is a claim we are required to resolve. Notably, the district court, whose judgment we are reviewing, also specifically held that a pre-deprivation hearing was required, absent an emergency.

It is somewhat ironic that the concurrence, which accuses us of underestimating the importance of custodial rights, would hold that a claim based on those rights can be waived in its entirety for failing to use a preferred method of argumentation.

*See Wilkinson*, 125 S.Ct. at 2395 ("[T]he requirements of due process are flexible and call for such procedural protections as the particular situation demands") (internal quotations, citation, and punctuation omitted). *Compare, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (pre-termination hearing required before welfare benefits may be discontinued) *with Mathews v. Eldridge*, 424 U.S. 319, 349 (1976) (no evidentiary hearing required before termination of disability benefits). Moreover, an interest may simply be too weak, under the balancing tests, to require any additional procedures. *See*, *e.g.*, *Zakrzewski,* 87 F.3d at 1014 (state post-deprivation remedies to enforce visitation orders were constitutionally sufficient).

Furthermore, many of the reasons to be cautious with substantive due process are not present in procedural due process. Procedural due process is not limited to interests which are "fundamental." Procedural due process also has not been considered to raise the same concerns of unbounded discretion and judicial supremacy.

Having determined Brittain has a protected liberty interest, we turn to what procedures were constitutionally required. *Mathews* provides the applicable test for determining how much process is due, and directs us to examine:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334-35.

Brittain has not alleged any failure of post-deprivation proceedings. Presumably, Brittain could have petitioned the state

court for a clarification of the custody order and a makeup visitation week. *See* Cal. Fam. Code §§ 3022, 3028 (West 2004); *see In re Marriage of Kreiss*, 19 Cal. Rptr. 3d 260, 261-62 (Cal. Ct. App. 2004) (California courts retain continuing jurisdiction to enforce and modify custody orders). Brittain instead challenges the lack of a pre-deprivation hearing (citing *Ram* and *Wallis*) before she could be deprived of one week of visitation. We must therefore determine whether a pre-deprivation hearing was required under *Mathews*.

Under the first part of *Mathews*, there are three important private interests at stake. First, there is Brittain's interest in being able to enjoy the visitation rights to which she is allegedly entitled under the custody order without interference by the police. Second, we must consider Hansen's interest enjoying the custodial rights to which he is also allegedly entitled. Finally, we must consider Matthew's interest.

By requiring a pre-deprivation hearing before any coerced transfer of a child, we would essentially award the parent then holding the child with continued custody until the matter could be adjudicated. The potential exposure of the custodial parent is therefore greater because that parent has more custodial time to lose. In addition, the liberty interest of the custodial parent is already greater than the parent with visitation rights. Hansen's interest, as well as his potential exposure to erroneous deprivation, is therefore greater in both magnitude and duration.

Nor is there an overwhelming liberty interest in a single week of visitation. *Cf. Terry*, 346 F.3d at 786 ("Losing a single day of visitation differs in kind and duration from the deprivations [in child abuse cases] cited by [plaintiff], which is significant because the gravity of his loss determines the process to which he is entitled") (citations omitted). The applicable interest here is even less, however. Because the state courts could provide a makeup week or other relief, Brittain's liberty interest for this procedural due process analysis

is more limited. We must consider Brittain's interest in having a particular week of visitation, rather than a makeup week, as well as her interest in not having any week infringed upon by the police without a prior hearing. *Cf. Mathews*, 424 U.S. at 340 ("Since a [social security disability] recipient whose benefits are terminated is awarded full retroactive relief if he ultimately prevails, his sole interest is in the uninterrupted receipt of this source of income pending final administrative decision on his claim"). Against this we must weigh Hansen's interest in regaining custody, without needing to go though the time and expense of a full pre-deprivation hearing, where there has been a potentially wrongful withholding. Brittain's interest is therefore limited and substantially outweighed by the interest of Hansen.

Matthew's interests do not appear to affect the balance of interests significantly. Children undoubtedly have an interest in not being transferred by the police over the objections of one of their parents. However, children also have an interest in seeing that the custody schedule set out by the state court is followed. This is particularly true as custody schedules are usually adjudicated to be in the best interest of the child. *See* Cal. Fam. Code § 3100 (West 2004). Finally, if children are being wrongfully held by a parent, they have a clear interest in being returned to the parent who is entitled to physical custody at the time without additional time-consuming procedures. Matthew's interests therefore do not appear to weigh substantially towards or against a pre-deprivation hearing.

Under the second part of *Mathews*, there would undoubtedly be some value to additional proceedings and somewhat lessened risk of erroneous deprivation. Given the exceptionally compressed time schedule any pre-deprivation hearing would require in order to adjudicate the very short periods of time involved, this value is somewhat limited. We are also mindful that many custodial disputes will be unambiguously wrongful withholdings of children, rather than interpretive disagreements over court orders. In such circumstances, the

value of additional procedures and the risk of erroneous deprivation are quite minimal and the interest of the parent whose child is wrongfully withheld is exceptionally great.

Under the third part of *Mathews*, California's interest in not requiring pre-deprivation hearings is significant. The administrative costs and burdens of a hearing on the merits of a custody dispute are substantially greater than the interest in a single week of visitation, especially where that week can be made up at a later date. Additionally, California's interest in enforcing its court judgments is significant. *See Duranceau v. Wallace*, 743 F.2d 709, 711-12 (9th Cir. 1984) (suggesting "strong governmental interest" in "expeditious enforcement of judgments" and stating that "[a]ny rule that requires hearings after judgment diminishes the value of judgments and threatens to turn litigation into an endless round of procedures with no possibility of vindication or ultimate success") (holding no pre-deprivation hearing was necessary before the state could enforce a disputed child support order). This interest would be significantly diminished if we were to require a hearing before any enforcement action can be taken. In the present case, the police have been called out about forty times to mediate this particular child custody dispute. If even a small fraction of those disputes were to require hearings, the administrative burden would be very substantial.

In addition, we are also guided by our sister circuits who have considered the issue of whether a pre-deprivation hearing is required before visitation can be denied on the basis of suspected child abuse. Although we believe it erroneous to apply child abuse precedents directly to this action, such precedents are instructive. We point out, however, the nature of the action, with the government acting in an adversarial and accusatorial role, will often require additional procedures in child abuse cases. *See Santosky*, 455 U.S. at 748-70.

The Eighth Circuit has held that there is no requirement of a pre-deprivation hearing before visitation can be reduced.

*See Fitzgerald v. Williamson*, 787 F.2d 403, 408 (8th Cir. 1986) (visitation reduced based on suspicion of child abuse). The court in that case held it was sufficient that the parents could have "petition[ed] the juvenile court for modification of custody orders at any time." *Id.* (citations omitted). Similarly, in *Zakrzewski* the court held that the availability of state post deprivation remedies to enforce visitation orders was constitutionally sufficient. 87 F.3d at 1014 (child custody dispute). The Seventh Circuit has also held that neither a pre-deprivation, nor immediate post-deprivation, hearing was constitutionally required where the parent's interest was only visitation. *See Terry*, 346 F.3d at 786-87 (suspected child abuse). Instead, the court held that available state remedies were sufficient. *Id.* at 787. Finally, the Second Circuit has also held that there was no clearly established right to a pre-deprivation hearing before reduction of visitation. *See Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) (stating that all cases to decide issue had found no right to pre-deprivation hearing).

**[21]** Guided by these precedents and based on our analysis under *Mathews*, we hold that no pre-deprivation hearing was required before Brittain could be deprived of a week of visitation. The available state procedures were sufficient to satisfy the requirements of due process.

**[22]** The states are, of course, free to require pre-deprivation proceedings by statute, as the state of Louisiana apparently has. *See Wooley*, 211 F.3d at 926. California has not, however, and we hold that California's procedures did not violate Brittain's Fourteenth Amendment rights. Because Brittain has failed to establish a violation of her procedural due process rights, there is no need for further inquiry regarding qualified immunity. *See Saucier*, 533 U.S. at 201. Campbell is entitled to qualified immunity on the procedural due process claim.

## V.

Brittain would have us interject burdensome new federal requirements into a field of law that is virtually the exclusive province of the states. We will not do so. Nor will we dramatically blur the vital distinctions between child abuse and child custody precedents.

Brittain's substantive due process claim fails because she has not alleged a sufficient deprivation of liberty and because Campbell's actions were not conscience shocking. Additionally, the Due Process Clause of the Fourteenth Amendment did not require a pre-deprivation hearing before Campbell could enforce the child custody order. Brittain has failed to show a violation of either her substantive or procedural due process rights; thus, Campbell is entitled to qualified immunity. *See Saucier*, 533 U.S. at 201.

**REVERSED**.

SILVERMAN, Circuit Judge, concurring:

With all due respect, the majority makes this case much more complicated than it needs to be. We should reverse the denial of qualified immunity to Deputy Campbell because the undisputed facts show that he acted reasonably in interpreting the ambiguous court order and in defusing the domestic dispute to which he had been summoned. It is as simple as that.

## I.

Deputy Campbell was called to the scene of a dispute between warring parents with a child caught in the cross-fire. In reliance on *his* interpretation of the custody decree, the father came to the mother's house, with bags packed and loaded in the car, ready to pick up the youngster and com-

mence a two-week vacation. In reliance on *her* interpretation of the decree, the mother refused to let the boy go. It was to this volatile situation that Deputy Campbell was called.

As this drama was playing out in the front yard of the mother's house, Campbell had to decide in a hurry what to do to peaceably resolve the situation lest it escalate out of control, a scenario which is not unheard of in such matters. Both parties relied on the terms of the custody decree. Although the court order was not a model of clarity as to who was entitled to Matthew on the dates in question, Campbell gave the decree a reasonable interpretation and caused the matter to be resolved in a civil fashion until the parties could return to court for clarification of the decree. Even if Campbell were mistaken in his interpretation, his conduct was exactly the sort of immediate, on-the-scene judgment by a law enforcement officer that qualified immunity was intended to protect. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Substantive due process protects individuals from arbitrary deprivations, *see Lewis*, 523 U.S. at 845, not the consequences of a reasonable, good-faith judgment call like the one made in this case. As we said in *Moreland*, 159 F.3d at 371 n.4, if an officer's actions "were objectively reasonable, it follows that his conduct did not offend the more stringent standard applicable to substantive due process claims." Thus, whatever the minimum standard of acceptable conduct for law enforcement officers responding to a dispute between parents over visitation rights, Campbell's actions clearly did not fall below that standard. For this reason, Campbell is entitled to qualified immunity under the first prong of *Saucier* — specifically, the plaintiffs failed to establish that a constitutional right was violated on the facts alleged. *See Saucier*, 533 U.S. at 200 ("[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged. . . .").

## II.

I write separately also to note a disagreement over another point. According to the majority, "a single *instance* of visitation, of a single week in duration," is not a fundamental right. (Emphasis in original.) I do not believe that is always true. Even though a non-custodial parent may have visitation "only" every other weekend, to some parents that weekend is the moon and the stars. *See, e.g.*, *Brown*, 722 F.2d at 364 (whether interest is substantial enough to warrant constitutional protection "depends on the security with which it is held under state law and its importance to the holder"). As a former state-court trial judge who has presided over thousands of domestic relations cases, I note that visitation rights are profoundly important both to non-custodial parents *and* their children. They are not afterthoughts; they are integral components of custody plans. It is well known that children who have regular, frequent, and hassle-free visitation with their non-custodial parents survive the breakup of their parents' relationship much better than those who do not.

Indeed, the Eighth Circuit's decision in *Zakrzewski* actually refutes the majority's position that depriving a parent of a one-week visitation period can never amount to a substantive due process claim. In that case, the court concluded that the officer's conduct in transferring the child to the custodial parent "was within the bounds of reasonableness" and thus dismissed the non-custodial parent's substantive due process claim. *See* 87 F.3d at 1014. It necessarily left open the possibility that, under other circumstances, an officer's conduct in removing a child from a non-custodial parent absent an emergency or court order may be so arbitrary or unreasonable as to constitute a due process violation. *Id.* ("[T]he one-time interruption of Zakrzewski's right to visitation *in this case* does not amount to a deprivation of liberty." (emphasis added)).

Had the decree in this case clearly granted visitation to Brittain for the date and time in question, I fail to see why a

plainly wrongful or malicious deprivation of those rights by a police officer, in the absence of an emergency or court order, would not constitute an "abuse of power." *Lewis*, 523 U.S. at 846. But that is not the case before us. Because Campbell acted reasonably under the circumstances, there was no deprivation of a constitutional right. Our inquiry should end there. *See Wilson v. Spain*, 209 F.3d 713, 717 (8th Cir. 2000) ("Since Spain's acts were objectively reasonable, however, no violation of the Fourth Amendment occurred, and there was no 'deprivation of rights.' ").

## III.

With respect to her procedural due process claim, Brittain also contends that in the face of the ambiguous decree, she had a "right" to expect Campbell to leave Matthew with her and do nothing at the scene except refer the parties back to court. She makes a cursory reference to *Ram* and *Wallis* to support that claim, but as the majority correctly points out, those are cases involving the removal of children from their homes and their placement in foster care by child protective services workers, cases that have no relevance here. Brittain makes no further effort at describing what process Officer Campbell owed her, and that is fatal to her procedural due process claim.